MASSACHUSETTS *v.* MORASH

No. 88–32.   Argued February 21, 1989—Decided April 18, 1989

STEVENS, J., delivered the opinion for a unanimous Court.

*Carl Valvo*, Assistant Attorney General of Massachusetts, argued the cause for petitioner. With him on the briefs were *James M. Shannon*, Attorney General, and *Marc C. Laredo* and *Ruth A. Bourquin*, Assistant Attorneys General.

*Jason Berger* argued the cause for respondent. With him on the brief was *Marcia E. Greenberg*.*

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Deputy Solicitor General Ayer, Christopher J. Wright, George R. Salem, Allen H. Feldman,* and *Edward D. Sieger;* for the State of New York et al. by *Robert Abrams,* Attorney General, *O. Peter Sherwood,* Solicitor General, *Lawrence S. Kahn,* Deputy Solicitor General, and *Jane Lauer Barker, M. Patricia Smith,* and *Jennifer S.*

JUSTICE STEVENS delivered the opinion of the Court.

This case requires us to determine whether a company's policy of paying its discharged employees for their unused vacation time constitutes an "employee welfare benefit plan" within the meaning of § 3(1) of the Employee Retirement Income Security Act of 1974 (ERISA or Act), 88 Stat. 833, as amended, 29 U. S. C. § 1002(1), and whether a criminal action to enforce that policy is foreclosed by the Act's broad pre-emption provision.

## I

In May 1986, petitioner, the Commonwealth of Massachusetts, issued two complaints in the Boston Municipal Court against respondent, Richard N. Morash, president of the Yankee Bank for Finance and Savings (Bank). The complaints charged Morash with criminal violations of the Massachusetts Payment of Wages Statute, Mass. Gen. Laws § 149:148 (1987).[1]

Under the Massachusetts law, an employer is required to pay a discharged employee his full wages, including holiday or vacation payments, on the date of discharge. Similar wage payment statutes have been enacted by 47 other States,[2] the

---

*Brand*, Assistant Attorneys General; and for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg, Julia Penny Clark*, and *Laurence Gold*.

[1] Massachusetts Gen. Laws § 149:148 (1987) provides, in pertinent part:

"Every person having employees in his service shall pay weekly each such employee the wages earned by him . . . ; and any employee discharged from such employment shall be paid in full on the day of his discharge . . . . The word 'wages' shall include any holiday or vacation payments due an employee under an oral or written agreement."

[2] See Alaska Stat. Ann. §§ 23.05.140 to 23.05.340 (1984 and Supp. 1988); Ariz. Rev. Stat. Ann. §§ 23–350 to 23–361 (1983 and Supp. 1988); Ark. Code Ann. § 11–4–401 (1987); Cal. Lab. Code Ann. § 227.3 (West Supp. 1989); Colo. Rev. Stat. §§ 8–4–101 to 8–4–126 (1986); Conn. Gen. Stat. §§ 31–71a to 31–71i (1987 and Supp. 1988); Del. Code Ann., Tit. 19, §§ 1101 to 1115 (1985); Ga. Code Ann. § 34–7–2 (1988); Haw. Rev. Stat. §§ 388–1 to 388–13 (1988); Idaho Code §§ 45–601 to 45–615 (1977 and Supp. 1988); Ill. Rev. Stat., ch. 48, ¶¶ 39m–1 to 39m–15 (1987); Ind. Code §§ 22–2–9–1 to

District of Columbia,[3] and the United States,[4] and over half of these include vacation pay. The complaints filed in the Boston Municipal Court alleged that respondent had failed to compensate two discharged bank vice presidents for vacation time they accrued but did not use.

Respondent moved to dismiss the criminal complaints on the ground that the Massachusetts statute, insofar as it applied to these complaints, had been pre-empted by ERISA. He argued that the Bank's vacation policy constituted an "employee welfare benefit plan" under the Act, and that the State's prosecution of him for failure to comply with the policy therefore ran afoul of § 514(a) of the Act, 29 U. S. C.

---

22–2–9–7 (1988); Iowa Code §§ 91A.2 to 91A.13 (1985); Kan. Stat. Ann. §§ 44–313 to 44–327 (1986); Ky. Rev. Stat. Ann. §§ 337.010 to 337.070 (Baldwin 1986); La. Rev. Stat. Ann. § 631 (West 1985 and Supp. 1989); Me. Rev. Stat. Ann., Tit. 26, §§ 621–626 (1988); Md. Ann. Code, Art. 100, § 94 (1985); Mich. Comp. Laws §§ 408.471 to 408.475 (1985); Minn. Stat. § 181.74 (1988); Miss. Code Ann. §§ 71–1–35 to 71–1–53 (1972 and Supp. 1988); Mo. Rev. Stat. §§ 290.080 to 290.110 (1986); Mont. Code Ann. §§ 39–3–201 to 39–3–215 (1987); Neb. Rev. Stat. § 48–1228 to 48–1232 (1988); Nev. Rev. Stat. §§ 608.005 to 608.060 (1987); N. H. Rev. Stat. Ann. §§ 275:42 to 275:55 (1987); N. J. Stat. Ann. §§ 34:11–4.1 to 34:11–4.11 (West 1988); N. M. Stat. Ann. §§ 50–4–1 to 50–4–12 (1988); N. Y. Lab. Law §§ 190 to 198–c (McKinney 1986 and Supp. 1989); N. C. Gen. Stat. §§ 95–25.2 to 95–25.25 (1985); N. D. Cent. Code §§ 34–14–01 to 34–14–13 (1987); Ohio Rev. Code Ann. § 4113.15 (1980); Okla. Stat., Tit. 40, §§ 165.1 to 165.9 (1986); Ore. Rev. Stat. §§ 652.110 to 652.405 (1987); Pa. Stat. Ann., Tit. 43, §§ 260.2a to 260.11a (Purdon Supp. 1988); R. I. Gen. Laws §§ 28–14–1 to 28–14–30 (1986); S. C. Code §§ 41–10–10 to 41–10–110 (Supp. 1988); S. D. Codified Laws §§ 60–11–9 to 60–11–15 (1978); Tenn. Code Ann. § 50–2–103 (1983); Tex. Rev. Civ. Stat. Ann., Art. 5155 to 5159 (Vernon 1987); Utah Code Ann. §§ 34–28–2 to 34–28–14 (1988); Vt. Stat. Ann., Tit. 21, §§ 341–345 (1987); Va. Code § 40.1–29 (1986); Wash. Rev. Code §§ 49.48.010, 49.48.020 (1987); W. Va. Code §§ 21–5–1, 21–5–4 (1985 and Supp. 1988); Wis. Stat. §§ 109.01 to 109.11 (1987–1988); Wyo. Stat. §§ 27–4–101 to 27–4–105 (1987).

[3] See D. C. Code §§ 36–101 to 36–110 (1981).

[4] See, e. g., 46 U. S. C. § 596. See also *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 572 (1982).

§ 1144(a), which pre-empts "any and all State laws insofar as they . . . relate to any employee benefit plan."[5] Without ruling on the motion, the trial judge reported the pre-emption question to the Massachusetts Appeals Court for decision; the Supreme Judicial Court then transferred the case to its docket on its own initiative. For the purpose of answering the reported question, the parties stipulated that the Bank had made oral or written agreements stemming from handbooks, manuals, memoranda, and practices to pay employees in lieu of unused vacation time, and that "such payments are made out of the Bank's general assets" in lump sums upon termination of employment.

The Supreme Judicial Court held that the policy constituted an employee welfare benefit plan and that the prosecution was pre-empted by ERISA. 402 Mass. 287, 522 N. E. 2d 409 (1988). The court found that under the plain language of the statute and its earlier decision in *Barry* v. *Dymo Graphic Systems, Inc.*, 394 Mass. 830, 478 N. E. 2d 707 (1985), the Bank's policy constituted a plan, fund, or program for the purpose of providing its participants vacation benefits. It rejected the Commonwealth's argument that a regulation promulgated by the Secretary of Labor (Secretary),[6]

---

[5] Section 514 of ERISA, as codified, provides, in pertinent part:

"(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .

"(b) . . .

.      .      .      .      .

"(4) Subsection (a) of this section shall not apply to any generally applicable criminal law of a State."

[6] The Secretary's payroll practice regulation provides, in part:

"(b) *Payroll practices.* For purposes of Title I of the Act and this chapter, the terms 'employee welfare benefit plan' and 'welfare plan' shall not include—

.      .      .      .      .

"(3) Payment of compensation, out of the employer's general assets, on account of periods of time during which the employee, although physically

had excepted payments out of an employer's general assets for unused vacation time from the definition of a welfare plan because even if regular vacation pay was not included in ERISA, the lump-sum payment for unused vacation time upon discharge was akin to severance pay covered by ERISA. The fact that it would be necessary for an employer to maintain records relating to its employees' unused vacation time, plus the need to accumulate funds to pay the benefits, made it appropriate to treat the employer's promise to its employees as a "plan." The court concluded that the Massachusetts statute related to the plan within the meaning of § 514, and was not excluded from its coverage by the provision saving from pre-emption a "generally applicable criminal law." ERISA § 514(b)(4), 29 U. S. C. § 1144(b)(4).

Because the federal question decided by the Supreme Judicial Court is an important one over which the courts have disagreed,[7] we granted certiorari, 488 U. S. 815 (1988). We now reverse.

## II

ERISA was passed by Congress in 1974 to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits. *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 15

_____

and mentally able to perform his or her duties and not absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment) performs no duties; for example—

"(i) Payment of compensation while an employee is on vacation or absent on a holiday, including payment of premiums to induce employees to take vacations at a time favorable to the employer for business reasons." 29 CFR § 2510.3–1(b)(3) (1987).

[7] Compare *Holland* v. *National Steel Corp.*, 791 F. 2d 1132 (CA4 1986); *Blakeman* v. *Mead Containers*, 779 F. 2d 1146 (CA6 1985) (both holding that vacation benefits constitute employee welfare benefit plan), with *Shea* v. *Wells Fargo Armored Service Corp.*, 810 F. 2d 372 (CA2 1987); *California Hospital Assn.* v. *Henning*, 770 F. 2d 856 (1985), modified, 783 F. 2d 946 (CA9), cert. denied, 477 U. S. 904 (1986); *Golden Bear Family Restaurants, Inc.* v. *Murray*, 144 Ill. App. 3d 616, 494 N. E. 2d 581 (1986) (all holding that vacation pay from employer's general assets not covered by ERISA).

(1987). The "comprehensive and reticulated statute," *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 361 (1980), contains elaborate provisions for the regulation of employee benefit plans. It sets forth reporting and disclosure obligations for plans, imposes a fiduciary standard of care for plan administrators, and establishes schedules for the vesting and accrual of pension benefits. *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 732 (1985). Suits to enforce the terms of the statute and to recover welfare benefits wrongfully withheld arise under federal law and can be brought in federal court without regard for the amount in controversy. See *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U. S. 101, 108 (1989).

The precise coverage of ERISA is not clearly set forth in the Act. ERISA covers "employee benefit plans," which it defines as plans that are either "an employee welfare benefit plan," or "an employee pension benefit plan," or both. ERISA § 3(3), 29 U. S. C. § 1002(3). An employee welfare benefit plan, in turn, is defined as:

> "[A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions)." ERISA § 3(1), as codified, 29 U. S. C. § 1002(1).[8]

---

[8] The benefits described "in section 186(c) of this title" include "pooled vacation, holiday, severance or similar benefits." See 29 U. S. C. § 186(c)(6).

The Act does not further define "plan, fund, or program" or "vacation benefits" and does not specify whether every policy to provide vacation benefits falls within its ambit.

The words "any plan, fund, or program . . . maintained for the purpose of providing . . . vacation benefits" may surely be read to encompass any form of regular vacation payments to an employee. A multiemployer fund created to provide vacation benefits for union members who typically work for several employers during the course of a year, see, *e. g., Franchise Tax Bd. of Cal.* v. *Construction Laborers Vacation Trust for Southern Cal.*, 463 U. S. 1, 4, n. 2 (1983), undoubtedly falls within the scope of the Act. In addition, the creation of a separate fund to pay employees vacation benefits would subject a single employer to the regulatory provisions of ERISA. See *California Hospital Assn.* v. *Henning*, 770 F. 2d 856, 861 (1985), modified, 783 F. 2d 946 (CA9), cert. denied, 477 U. S. 904 (1986).[9] We do not believe, however, that the policy here to pay employees for unused vacation time constitutes an employee welfare benefit plan.

The interpretation of § 3(1) is governed by the familiar principles that " 'words grouped in a list should be given re-

---

[9] Respondent argues that because a pooled vacation benefit plan is "a benefit described in section 186(c) of this title" and thus constitutes an employee welfare benefit plan under 29 U. S. C. § 1002(1)(B), the exclusion of ordinary vacation pay plans from ERISA coverage would render the reference to vacation pay in clause (A) surplusage. Clause (A), however, also includes within ERISA vacation wages paid from a separate fund rather than from general assets. See United States Dept. of Labor, ERISA Opinion Letter No. 77–84A (Nov. 7, 1977). The fact that a benefit covered by clause (B) is also covered by clause (A) is not dispositive of the meaning of clause (A). As the Court of Appeals for the Ninth Circuit noted: "Many of the benefits incorporated in section 1002(1) by the cross-reference to section 186(c) are already found in section 1002(1). Thus it is evident that Congress was not concerned with duplication, but only with assuring that all benefits covered by section 186(c) were also covered by section 1002(1)." *California Hospital Assn.* v. *Henning*, 770 F. 2d 856, 861 (1985), modified, 783 F. 2d 946, cert. denied, 477 U. S. 904 (1986).

lated meaning,'" *Schreiber* v. *Burlington Northern, Inc.*, 472 U. S. 1, 8 (1985) (quoting *Securities Industry Assn.* v. *Board of Governors, FRS*, 468 U. S. 207, 218 (1984)), and that "in expounding a statute, we [are] not . . . guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 51 (1987). In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds. *California Hospital Assn., supra*, at 859.[10] To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator. Because ordinary vacation payments are typically fixed, due at known times, and do not depend on contingencies outside the employee's control, they present none of the risks that ERISA is intended to address. If there is a danger of defeated expectations, it is no different from the danger of defeated expectations of wages for services performed—a danger Congress chose not to regulate in ERISA.

This conclusion is supported by viewing the reference to vacation benefits not in isolation but in light of the words that accompany it and give the provision meaning. Section 3(1) subjects to ERISA regulation plans to provide medical, sickness, accident, disability, and death benefits, training programs, day care centers, scholarship funds, and legal services. The distinguishing feature of most of these benefits is

---

[10] See *e. g.*, Private Welfare and Pension Plan Legislation: Hearings on H. R. 1045 et al. before the General Subcommittee on Labor of the House Committee on Education and Labor, 91st Cong., 1st and 2d Sess., 470–472 (1970) (testimony of Secretary of Labor concerning mismanagement of 22 pension and welfare funds); 120 Cong. Rec. 4279–4280 (1974) (remarks of Rep. Brademas); *id.*, at 4277–4278 (remarks of Rep. Perkins); 119 Cong. Rec. 30003 (1973) (remarks of Sen. Williams).

that they accumulate over a period of time and are payable only upon the occurrence of a contingency outside of the control of the employee. See 40 Fed. Reg. 24642 (1975). Thus, for example, plans to pay employees severance benefits, which are payable *only* upon termination of employment, are employee welfare benefit plans within the meaning of the Act. See *Holland* v. *Burlington Industries, Inc.*, 772 F. 2d 1140 (CA4 1985), summarily aff'd *sub nom. Brooks* v. *Burlington Industries, Inc.*, 477 U. S. 901 (1986); *Gilbert* v. *Burlington Industries, Inc.*, 765 F. 2d 320 (CA2 1985), summarily aff'd *sub nom. Roberts* v. *Burlington Industries, Inc.*, 477 U. S. 901 (1986). The reference to vacation payments in § 3(1) should be understood to include within the scope of ERISA those vacation benefit funds, analogous to other welfare benefits, in which either the employee's right to a benefit is contingent upon some future occurrence or the employee bears a risk different from his ordinary employment risk. It is unlikely that Congress intended to subject to ERISA's reporting and disclosure requirements those vacation benefits which by their nature are payable on a regular basis from the general assets of the employer and are accumulated over time only at the election of the employee.

The Secretary, who is specifically authorized to define ERISA's "accounting, technical, and trade terms," ERISA § 505, 29 U. S. C. § 1135,[11] and to whose reasonable views we give deference, *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984); *Watt* v. *Alaska*, 451 U. S. 259, 272–273 (1981); *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965), has also so understood the statute. In a Notice of Proposed Rulemaking published shortly after the effective date of the Act, the Secretary identified a basic

---

[11] Section 505, 88 Stat. 894, provides, in part:

"Subject to title III and section 109, the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this title. Among other things, such regulations may define accounting, technical, and trade terms used in such provisions . . . ."

distinction between the benefit programs covered by the Act and the types of regular compensation, including vacation pay, that are not covered:

> "The Secretary also anticipates issuance of regulations that will make it clear that other programs, including certain employer practices (whether pursuant to a collective bargaining agreement or not) under which employees are paid as a part of their regular compensation directly by the employer and under which no separate fund is established will not subject the employer to any filing or disclosure duties under Title I of the Act. Examples of the employer practices that may receive this treatment are payment of overtime pay, *vacation pay*, shift premiums, Sunday premiums, holiday premiums, jury duty or military duty, make-up pay, and pay while absent on account of illness or excused absences." 39 Fed. Reg. 42236 (1974) (emphasis added).

The Secretary subsequently proposed regulations excluding payment of compensation for work performed at night or during holidays and paid sick leave and vacation leave from the definition of an employee benefit. 40 Fed. Reg. 24642–24643 (1975). He explained:

> "[P]aid vacations . . . are not treated as employee benefit plans because they are associated with regular wages or salary, rather than benefits triggered by contingencies such as hospitalization. Moreover, the abuses which created the impetus for the reforms in Title I were not in this area, and there is no indication that Congress intended to subject these practices to Title I coverage." *Ibid.*

The proposed regulations promulgated by the Secretary were adopted without significant modification. They provide that numerous "payroll practices," including the payment of vacation benefits "out of [an] employer's general assets" rather than from a trust fund, are not employee

welfare benefit plans within the meaning of ERISA.[12]   In addition, under the regulations, the term "employee welfare benefit plan" does not include the payment by an employer of premium rates for work performed during special periods such as holidays and weekends.[13]   The Secretary has consistently adhered to this position even when the premium pay is accumulated and carried over to later years.[14]

A contrary interpretation, including routine vacation pay policies within ERISA, would have profound consequences. Most employers in the United States provide some type of vacation benefit to their employees.[15]   ERISA coverage would put all these employers to the choice of complying with the statute's detailed requirements for reporting and disclosure or discontinuing the practice of compensating employees for unused vacation time.   In addition, the extension of ERISA to claims for vacation benefits would vastly expand the jurisdiction of the federal courts, providing a federal

---

[12] See n. 6, *supra.*

[13] The Secretary's regulation provides, in part:

"(b)(1) Payment by an employer of compensation on account of work performed by an employee, including compensation at a rate in excess of the normal rate of compensation on account of performance of duties under other than ordinary circumstances, such as—

"(i) Overtime pay,

"(ii) Shift premiums,

"(iii) Holiday premiums,

"(iv) Weekend premiums."   29 CFR § 2510.3–1(b)(1) (1987).

[14] See United States Dept. of Labor, ERISA Opinion Letter No. 79–48A (July 30, 1979) (sick leave).

[15] A 1988 survey reflects that paid vacations are provided to 98 percent of the 31,000,000 employees in medium and large establishments.   United States Dept. of Labor, Bureau of Labor Statistics, BLS Reports on Employee Benefits in Medium and Large Firms in 1988, pp. 1, 4 (Apr. 4, 1989) (press release).   Another survey of 833 companies in manufacturing and nonmanufacturing industries found that 86 percent of them provided payments for, or in lieu of, vacations.   United States Chamber of Commerce, Employee Benefits 1986, p. 21 (1987).

forum for any employee with a vacation grievance.[16]  Finally, such an interpretation would also displace the extensive state regulation of the vesting, funding, and participation rights of vacation benefits; because ERISA's vesting and funding requirements do not apply to welfare benefit plans, ERISA §§ 201(1), 301(a), as amended, 29 U. S. C. §§ 1051(1), 1081(a), employees would actually receive less protection if ERISA were applied to ordinary vacation wages paid from the employer's general assets.  See Note, 87 Colum. L. Rev. 1702, 1718 (1987).[17]  The States have traditionally regulated the payment of wages, including vacation pay.  Absent any indication that Congress intended such far-reaching consequences, we are reluctant to so significantly interfere with "the separate spheres of governmental authority preserved in our federalist system."  *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S., at 19.

## III

Respondent argues that, even if the Department of Labor regulation exempting vacation payments from ERISA constitutes a reasonable construction of the Act, the Bank's policy did not constitute a payroll practice under the regulation because employees were allowed at their option to accumulate vacation time and defer payment for such time until termination.  See Brief for Respondent 11.  We do not agree. Although neither of the Secretary's regulations explicitly covers the precise practice at issue in this case, the reasons for treating holiday and weekend premiums and payments of compensation while an employee is on vacation as "payroll

---

[16] A 1983 survey found that state agencies each year resolve more than 19,000 vacation pay claims, involving more than $7.5 million.  Note, 16 Loyola U. Chi. L. J. 387, 422 (1985).

[17] Many States have provisions for the vesting of vacation benefits, see Note, 87 Colum. L. Rev. 1702, 1714 (1987), and for the administrative resolution of vacation pay claims, Note, 16 Loyola U. Chi. L. J., at 421–422. An interpretation of ERISA to include ordinary vacation pay would imperil these mechanisms designed for the benefit of employees.

practices" are equally applicable to the payment of an employee's regular wages for accrued and unused vacation time upon discharge. If the employees in this case had chosen to take a vacation, the vacation days would have been available and the vacation benefit would have been excluded under the regulation; the benefit cannot be transformed into an employee welfare benefit plan under ERISA solely because the employees did not use their vacation days prior to their formal termination of employment. See *Shea* v. *Wells Fargo Armored Service Corp.*, 810 F. 2d 372, 377 (CA2 1987).

Moreover, except for the fact that the payment has been deferred, such payments are as much a part of the employees' regular basic compensation as overtime pay or the payment of salary while the employee is absent on vacation. If in the end the employee elects to receive additional compensation instead of a paid vacation, he or she is receiving the same kind of premium pay that is available for holiday or weekend work. The fact that the payments in this case were due at the time of the employee's termination does not affect their character as a part of regular compensation. Unlike normal severance pay, the employees' right to compensation for accrued vacation time is not contingent upon the termination of their employment.

In reaching this conclusion, we emphasize that the case before us — and the Secretary's regulations on which we rely — concern payments by a single employer out of its general assets. An entirely different situation would be presented if a separate fund had been created by a group of employers to guarantee the payment of vacation benefits to laborers who regularly shift their jobs from one employer to another. Employees who are beneficiaries of such a trust face far different risks and have far greater need for the reporting and disclosure requirements that the federal law imposes than those whose vacation benefits come from the same fund from which they receive their paychecks. It is sufficient for this case that the Secretary's determination that a single employ-

er's administration of a vacation pay policy from its general assets does not possess the characteristics of a welfare benefit plan constitutes a reasonable construction of the statute.[18]

The judgment of the Massachusetts Supreme Judicial Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[18] We therefore have no occasion to address the Commonwealth's alternative argument that Mass. Gen. Laws § 149:148 (1987) is a "generally applicable criminal law of a State" within the meaning of ERISA § 514(b)(4), 29 U. S. C. § 1144(b)(4).