[No. C005645. Third Dist. June 26, 1990.]

OPERATING ENGINEERS & PARTICIPATING EMPLOYEES PRE-APPRENTICE, APPRENTICE AND JOURNEYMAN AFFIRMATIVE ACTION TRAINING FUND et al., Plaintiffs and Appellants, v.
WEISS BROS. CONSTRUCTION CO., et al., Defendants and Respondents.

868

**COUNSEL**

Joe R. McCray, Stanton, Kay & Watson, Lawrence H. Kay and Bruce K. Leigh for Plaintiffs and Appellants.

Graham & Jonas, Kent Jonas, Sedgwick, Detert, Moran & Arnold, David E. Bordon, Frederick D. Baker, Marilyn Klinger, Bolling, Walter & Gawther and Mark E. Otto for Defendants and Respondents.

**OPINION**

**DAVIS, J.**—Plaintiffs Operating Engineers & Participating Employees Pre-Apprentice, Apprentice and Journeyman Affirmative Action Training Fund

(the Trust Fund) and the Operating Engineers Joint Apprenticeship Committee for Northern California (the JAC) appeal from the trial court's judgment in favor of defendants Weiss Bros. Construction Co., doing business as Weisscal, David Weiss, Alan Weiss, and Fidelity and Surety Company of Maryland.[1] After ruling that the Employee Retirement Income Security Act (ERISA) preempted the JAC's breach of contract action against Weisscal, the trial court sustained the demurrer to and dismissed the first amended complaint. We shall follow the recent Ninth Circuit decision in *Hydrostorage* v. *Northern Cal. Boilermakers* (9th Cir. 1989) 891 F.2d 719, and affirm.

## BACKGROUND

In ruling on a judgment of dismissal following the sustaining of a demurrer without leave to amend, we take as true the complaint's well-pleaded facts. (See, e.g., *Leach* v. *Drummond Medical Group, Inc.* (1983) 144 Cal.App.3d 362, 366 [192 Cal.Rptr. 650], quoting *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 827-828 [134 Cal.Rptr. 839].) According to the first amended complaint, the Trust Fund is an employee benefit plan under ERISA. (See 29 U.S.C. §§ 1002 & 1003.) It was created by a collective bargaining agreement. The JAC is "an apprenticeship program committee registered with the State of California, Department of Industrial Relations, Division of Apprenticeship Standards." Its responsibilities include "protection of apprentices registered by the State of California in the [JAC's] training program, including the authority to enforce the right of such apprentices to certain wages and fringe benefits."

In May 1985, the County of Santa Clara awarded Weisscal a contract for the San Jose Transit Mall Light Rail Project (the Project). On July 25, 1985, pursuant to Labor Code section 1777.5,[2] Weisscal signed a "DAS 7" form "Agreement to Train Apprentices" (the DAS 7 agreement.)[3]

---

[1] For convenience, unless otherwise indicated, we refer to appellants collectively as the JAC and respondents collectively as Weisscal.

[2] Unless otherwise indicated, further undesignated statutory citations refer to the Labor Code.

[3] DAS stands for the Division of Apprenticeship Standards.

Section 1777.5 states: "Nothing in this chapter shall prevent the employment of properly registered apprentices upon public works.

"Every such apprentice shall be paid the standard wage paid to apprentices under the regulations of the craft or trade at which he or she is employed, and shall be employed only at the work of the craft or trade to which he or she is registered.

"Only apprentices, as defined in Section 3077, who are *in training under apprenticeship standards and written apprentice agreements* under Chapter 4 (commencing with Section 3070) of Division 3, are eligible to be employed on public works. *The employment and train-*

Under the DAS 7 agreement, Weisscal agreed to "train apprentices [as Operating Engineers] in accordance with the apprenticeship standards and apprenticeship agreement and to comply with the provisions thereof." The JAC agreed to provide apprentices and the State of California, Department of Industrial Relations, Division of Apprenticeship Standards, approved the agreement.

*ing of each apprentice shall be in accordance with the apprenticeship standards and apprentice agreements under which he or she is training.*

"When the contractor to whom the contract is awarded by the state or any political subdivision, or any subcontractor under him or her, in performing any of the work under the contract or subcontract, employs workers in any apprenticeable craft or trade, *the contractor and subcontractor shall apply to the joint apprenticeship committee administering the apprenticeship standards of the craft or trade in the area of the site of the public work for a certificate approving the contractor or subcontractor under the apprenticeship standards for the employment and training of apprentices in the area or industry affected.* However, approval as established by the joint apprenticeship committee or committees shall be subject to the approval of the Administrator of Apprenticeship. The joint apprenticeship committee or committees, subsequent to approving the subject contractor or subcontractor, shall arrange for the dispatch of apprentices to the contractor or subcontractor in order to comply with this section. Every contractor and subcontractor shall submit contract award information to the applicable joint apprenticeship committee which shall include an estimate of journeyman hours to be performed under the contract, the number of apprentices to be employed and the approximate dates the apprentices will be employed. There shall be an affirmative duty upon the joint apprenticeship committee or committees administering the apprenticeship standards of the craft or trade in the area of the site of the public work to ensure equal employment and affirmative action in apprenticeship for women and minorities. Contractors or subcontractors shall not be required to submit individual applications for approval to local joint apprenticeship committees provided they are already covered by the local apprenticeship standards. *The ratio of work performed by apprentices to journeymen who shall be employed in the craft or trade on the public work may be the ratio stipulated in the apprenticeship standards under which the joint apprenticeship committee operates, but, except as otherwise provided in this section, in no case shall the ratio be less than one hour of apprentices work for every five hours of labor performed by a journeyman.* . . .

"Any ratio shall apply during any day or portion of a day when any journeyman, or the higher standard stipulated by the joint apprenticeship committee, is employed at the job site and shall be computed on the basis of the hours worked during the day by journeymen so employed, except for the land surveyor classification. *The contractor shall employ apprentices for the number of hours computed as above before the end of the contract.* However, the contractor shall endeavor, to the greatest extent possible, to employ apprentices during the same time period that the journeymen in the same craft or trade are employed at the job site. Where an hourly apprenticeship ratio is not feasible for a particular craft or trade, the Division of Apprenticeship Standards, upon application of a joint apprenticeship committee, may order a minimum ratio of not less than one apprentice for each five journeymen in a craft or trade classification.

*"The contractor or subcontractor, if he or she is covered by this section, upon the issuance of the approval certificate, or if he or she has been previously approved in the craft or trade, shall employ the number of apprentices or the ratio of apprentices to journeymen stipulated in the apprenticeship standards.* Upon proper showing by the contractor that he or she employs apprentices in the craft or trade in the state on all of his or her contracts on an annual average of not less than one hour of apprentice work for every five hours of labor performed by a journeyman, or in the land surveyor classification, one apprentice for each five journeymen, the

According to the complaint, Weisscal failed to pay certain wages and fringe benefits required under the Trust Fund agreement and section 1777.5. Weisscal also allegedly failed to hire apprentices as required under the DAS 7 agreement and section 1777.5.

On February 19, 1988, the JAC sued Weisscal and its license and payment bond sureties.[4] On May 31, 1988, JAC filed its first amended com-

Division of Apprenticeship Standards may grant a certificate exempting the contractor from 1-to-5 hourly ratio as set forth in this section. This section shall not apply to contracts of general contractors or to contracts of specialty contractors not bidding for work through a general or prime contractor, when the contracts of general contractors or those specialty contractors involve less than thirty thousand dollars ($30,000) or 20 working days. Any work performed by a journeyman in excess of eight hours per day or 40 hours per week, shall not be used to calculate the hourly ratio required by this section.

" 'Apprenticeable craft or trade,' as used in this section, means a craft or trade determined as an apprenticeable occupation in accordance with rules and regulations prescribed by the Apprenticeship Council. The joint apprenticeship committee shall have the discretion to grant a certificate, which shall be subject to the approval of the Administrator of Apprenticeship, exempting a contractor from the l-to-5 ratio set forth in this section when it finds that any one of the following conditions is met:

"(a) Unemployment for the previous three-month period in the area exceeds an average of 15 percent.

"(b) The number of apprentices in training in such area exceeds a ration of 1 to 5.

"(c) There is a showing that the apprenticeable craft or trade is replacing at least one-thirtieth of its journeymen annually through apprenticeship training, either on a statewide basis, or on a local basis.

"(d) Assignment of an apprentice to any work performed under a public works contract would create a condition which would jeopardize his or her life or the life, safety, or property of fellow employees or the public at large or if the specific task to which the apprentice is to be assigned is of such a nature that training cannot be provided by a journeyman.

". . . . . . . . . .

"*A contractor to whom the contract is awarded, or any subcontractor under him or her, who, in performing any of the work under the contract, employs journeymen or apprentices in any apprenticeable craft or trade and who is not contributing to a fund or funds to administer and conduct the apprenticeship program in any craft or trade in the area of the site of the public work, to which fund or funds other contractors in the area of the site of the public work are contributing, shall contribute to the fund or funds in each craft or trade in which he or she employs journeymen or apprentices on the public work in the same amount or upon the same basis and in the same manner as the other contractors do,* but where the trust fund administrators are unable to accept the funds, contractors not signatory to the trust agreement shall pay a like amount to the California Apprenticeship Council. The contractor or subcontractor may add the amount of the contributions in computing his or her bid for the contract. The Division of Labor Standards Enforcement is authorized to enforce the payment of the contributions to the fund or funds as set forth in Section 227.

"*The body awarding the contract shall cause to be inserted in the contract stipulations to effectuate this section.* The stipulations shall fix the responsibility of compliance with this section for all apprenticeable occupations with the prime contractor." (Italics added.)

[4] The complaint alleged that Surety Company of the Pacific executed a $5,000 contractor's license bond for Weisscal. Surety Company of the Pacific is not party to this appeal.

The complaint alleged that Fidelity and Deposit Corporation executed a payment bond for Weisscal. Fidelity and Deposit Corporation is a respondent herein.

plaint against the same parties. It sought $110,440.96 in unpaid trust fund contributions and interest and $27,610.24 in liquidated damages for the failure to hire the apprentices.

Weisscal and one of the sureties demurred on the grounds that ERISA preempted the cause of action against them.[5] The trial court agreed and sustained the demurrer without leave to amend. On October 28, 1988, after denying the JAC's motion for reconsideration, the court dismissed the complaint against Weisscal. This timely appeal followed.

## DISCUSSION

The sole issue presented is ERISA's preemptive impact upon the JAC's cause of action. In *Hydrostorage v. Northern Cal. Boilermakers, supra*, 891 F.2d 719 (*Hydrostorage*), the Ninth Circuit considered a similar case. We draw upon the court's opinion to place our dispute in its legal context.[6]

"The State of California imposes certain conditions relating to apprentices upon contractors and subcontractors who perform contracts awarded by the state or its political subdivisions. *See* Cal. Labor Code, § 1777.5 (West Supp. 1989). Under section 1777.5 of the California Labor Code, contractors, with certain exceptions not relevant to this case, must (1) 'apply to the joint apprenticeship committee administering the apprentice shop standards of the craft or trade in the area of the site of the public work for a certificate approving the contractor or subcontractor under the apprenticeship standards for the employment and training of apprentices in the area or industry affected'; (2) employ apprentices in a ratio of no less than one apprentice for every five journeymen; and (3) 'contribute to the fund or funds in each craft or trade in which [the contractor] employs journeymen or apprentices on the public work in the same amount or upon the same basis and in the same manner as the other contractors do.' *Id.* As for the contribution requirement, if apprenticeship 'trust fund administrators are unable to accept [the] funds, contractors not signatory to the trust agreement' must pay 'a like amount to the California Apprenticeship Council.' *Id.*

[5] Weisscal and Fidelity and Deposit Corporation separately demurred. Surety Company of the Pacific, however, had answered the initial complaint.

[6] Weisscal has moved this court to take judicial notice of *Hydrostorage*. The case came down after the parties before us completed their appellate briefing. We directed supplemental briefing on the Ninth Circuit opinion's analytical impact upon the case before us.

Normally, when a party who has finished briefing wishes to alert this court to a subsequent decision, that party need only address a letter to this court's clerk (served on any other party) with the citation. Such an informal procedure avoids the cost of a formal motion under Evidence Code section 452. Given our resolution of the case before us, it must be evident to all who read this opinion, that we have "granted" Weisscal's motion.

". . . . . . . . . . . . . . . . . . .

"For willful noncompliance with section 1777.5's requirements, a contractor is subject to civil penalties and debarment from bidding on public works contracts for one year. *Id.* § 1777.7." (*Hydrostorage, supra*, 891 F.2d at pp. 721-722, fn. omitted.)

■ Disputes such as those in both *Hydrostorage* and the case before us arise when nonunion contractors sign public works contracts. Where a contractor has signed a collective bargaining agreement with an apprenticeable union, that agreement requires the contractor to abide by the relevant apprenticeship standards (the standards) for the covered trades. (891 F.2d at p. 721.) In such cases, the collective bargaining agreement provides a consensual framework directly incorporating the relevant standards into any given contract. ERISA preemption would only arise to the extent that section 1777.5 imposes requirements not otherwise found within the agreed standards. To date, no reported case has involved such a preemption argument.

Where, as with Weisscal and Hydrostorage, Inc. the contractor has *not* signed the relevant collective bargaining agreement, then section 1777.5 requires the contractor to agree to be bound by the relevant apprenticeship standards for the covered trade. In effect, the statute sets up a scheme to compel nonunion employers to join or comply with the relevant apprenticeship standards. *Hydrostorage* concluded that ERISA preempted such legally coerced compliance with such standards.

■ *Hydrostorage* summarized ERISA's relevant parts: "ERISA is a 'comprehensive remedial statute "designed to protect the interest of employees in pension and welfare plans, and to protect employers from conflicting and inconsistent state and local regulation of such plans."'" (*Local Union 598, Plumbers & Pipefitters Industry Journeymen & Apprentices Training Fund v. J.A. Jones Construction Co.*, 846 F.2d 1213, 1217 (9th Cir.) (*Jones*), aff'd, 488 U.S. 881, 109 S.Ct. 210, 102 L.Ed.2d 202 (1988), quoting *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1501 (9th Cir. 1985).) The statute 'sets forth reporting and disclosure obligations for plans, imposes a fiduciary standard of care for plan administrators, and establishes schedules for the vesting and accrual of pension benefits.' (*Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 1671-72, 104 L.Ed.2d 98 (1989) (*Morash*).)

"ERISA governs 'employee benefit plans,' which are statutorily defined as plans that are either an 'employee welfare benefit plan,' an 'employee pension benefit plan,' or both. 29 U.S.C. § 1002(3); *Morash*, 109 S.Ct. at 1672. The statute defines 'employee welfare benefit plan' as follows: "any

*plan, fund, or program* which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance *or otherwise,* (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, *apprenticeship or other training programs,* or day care centers, scholarship funds, or prepaid legal services. . . ." 29 U.S.C. § 1002(1) (emphasis added).[7]

"ERISA contains a very broad preemption clause. Section 514(a) of ERISA, as codified at 29 U.S.C. § 1144(a), provides that ERISA 'shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title. . . .' 29 U.S.C. § 1144(a) (emphasis added). 'State laws' are defined as 'all laws, decisions, rules, regulations, or other State action having the effect of law, of any State.' 29 U.S.C. § 1144(c)(1). A 'state' is defined as 'a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.' 29 U.S.C. § 1144(c)(2).

"Several exceptions exist to ERISA's broad preemption clause. Only one such exception is relevant to this case, however: ERISA's so-called 'savings clause.' Section 514(d) of ERISA, codified at 29 U.S.C. § 1144(d), provides that '[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law.' 29 U.S.C. § 1144(d)." (*Hydrostorage, supra,* 891 F.2d at p. 726.)

The Ninth Circuit continued: "ERISA does not define the terms 'plan,' 'fund,' 'program,' or 'apprenticeship training program.' *See. Morash,* 109 S.Ct. at 1672. Regulations issued by the Secretary of Labor under authority delegated by statute similarly fail to define these terms. *See* 29 C.F.R. § 2510.3-1 (1988); 29 U.S.C. § 1135. Moreover, of the very few reported decisions involving ERISA and apprenticeship funds or programs, none defines or analyzes the term 'apprenticeship training program.' In the ab-

[7] ERISA provides for civil enforcement of its provisions. "A civil action may be brought— (1) by a participant or beneficiary—[¶] (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan; . . . [¶] (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) enforce any provisions of this subchapter or other terms of the plan; . . ." (29 U.S.C. § 1132.)

sence of such guidance, we 'must give effect to [the statute's] plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning.' *Shaw*, 463 U.S. at 97, 103 S.Ct. at 2900; see also *id*. at 97 n. 16, 103 S.Ct. at 2900 n. 16; (quoting *Black's Law Dictionary* definitions in determining the meaning of phrase 'relates to' in ERISA' s preemption clause)." (*Hydrostorage, supra*, 891 F.2d at p. 727.)

*Hydrostorage* presented the Ninth Circuit with a suit by an employer who had signed a public works contract but had failed both to execute a DAS 7 agreement and to hire apprentices on its project in accordance with the relevant apprenticeship standards. (891 F.2d at pp. 722-723.) After a hearing, the California Apprenticeship Council's Appeal Board concluded that the employer, Hydrostorage, had "willfully failed to apply for approval to train apprentices." (*Id*. at p. 723.) It "ordered Hydrostorage barred from bidding on public works contracts for one year and assessed a civil penalty." (*Ibid*.) Hydrostorage then sued and claimed that ERISA preempted the council's order. (*Ibid*.)

After setting forth the above quoted legal background, the Ninth Circuit concluded that the case before it involved two ERISA plans. Under authority of *Local Union 598 etc.* v. *J. A. Jones Const. Co.* (9th Cir. 1988) 846 F.2d 1213, 1217, and the parties' stipulation, the court easily concluded that the trust fund before it was an ERISA employee benefit plan. (*Hydrostorage, supra*, 891 F.2d at pp. 727-728.) The court then turned to the status of the relevant apprenticeship standards themselves under ERISA: "A more difficult question is whether the Standards constitute an 'employee welfare benefit plan,' i.e., a 'plan' or 'program' which was 'established or maintained by an employer or by an employee organization, or by both, . . . for the purpose of providing for its participants . . . apprenticeship or other training programs.' 29 U.S.C. § 1002(1). We conclude that the Standards satisfy this definition. The Standards consist of a detailed, 16-page document which specifies the duties and procedure of the Committee, the minimum qualifications of apprentices, the maximum ratio of apprentices to journeymen on job locations, the terms and conditions of apprenticeships, and the hours and wages of apprentices. The Standards also provide for supplemental instruction as well as period examination of apprentices. The Standards clearly embody 'a method of design or action, procedure, or arrangement for accomplishment of a particular . . . object,' in this case the training of apprentices. *Black's Law Dictionary* 1036 (5th ed. 1979). In addition, there is no question that the Standards were established 'for the purpose of providing for its participants . . . apprenticeship or other training programs.' 29 U.S.C. § 1002(1). The Standards' stated purpose is 'the training of Boilermakers, skilled in all phases of the erection and repair industry, who will

be a credit to the industry.' Finally, the Standards were established by the Committee, an entity created by the collective bargaining agreement and composed of equal numbers of representatives of labor and management. As such, the Committee qualifies as 'an employer or . . . employee organization, or . . . both.' *Id.*

"The Standards are an integral part of a larger 'program' established for the purpose of providing 'apprenticeship . . . training.' *Id*. Thus, both the Fund and the Standards fall within the definition of an 'employee welfare benefit plan' under ERISA." (*Hydrostorage, supra*, 891 F.2d at p. 728.)[8]

After concluding that the case did involve ERISA covered employee welfare benefit plans, the court then reviewed whether the administrative order was a "State law" that "relate[s] to" such a plan. (891 F.2d at p. 729.) The court quickly determined that the order was a "state law" under ERISA. (*Ibid.*) It continued: "More difficult is the issue of whether the administrative order 'relates to' an ERISA employee benefit plan. We have required that a state law both 'relate to,' 29 U.S.C. § 1144(a) and 'purport[ ] to regulate, directly or indirectly,' 29 U.S.C. § 1144(c) an employee welfare benefit plan in order for it to be preempted. *Jones*, 846 F.2d at 1218; *Martori,* 781 F.2d at 1356. " ' "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." ' *Shaw*, 463 U.S. at 96-97, 103 S.Ct. at 2899-900. A law purports to regulate a plan if it attempts to reach in one way or another the terms and conditions of employee benefit plans. *Jones*, 846 F.2d at 1218, *Lane v. Goren*, 743 F.2d 1337, 1339 (9th Cir. 1984)." (*Hydrostorage, supra*, 891 F.2d at p. 729.)

The court first found that the order "clearly 'relates to' the Standards, which are part of an ERISA plan." (891 F.2d at p. 729.) The order penalized Hydrostorage for failing to sign the DAS 7 agreement. (*Id.* at p. 730.) Under that agreement, Hydrostorage would have been bound to fulfill the pertinent apprenticeship standards. As such, the court concluded that "the order undoubtedly 'relates to' an ERISA plan in the sense that the order has a 'connection with or reference to' the Standards." (*Ibid.*)

The court then found that the order " 'purports to regulate, indirectly or directly,' an ERISA plan." (891 F.2d at p. 730) It stated: "Again, the

---

[8] The court did not decide "whether the Committee itself, whose functions include the formulation and administration of the Standards, is also part of the employee welfare benefit plan. The Division strenuously argues that while the Fund is an ERISA plan, the Committee is not. The resolution of this issue has no bearing on our decision. Since the Standards and Fund constitute an ERISA plan, this case clearly falls within the coverage of ERISA." (*Ibid.*)

order's purpose is to require Hydrostorage and other contractors on public works projects to become bound by the Standards, an ERISA plan. [Citation.] The order is designed to enforce the terms of an ERISA plan. The same is true of the statute upon which the order is based, California Labor Code § 1777.5. *Section 1777.5 is aimed at enforcing the terms of an ERISA plan, the Standards, and compelling nonsignatory contractors to join or comply with such plans.* The underlying statute is therefore one which is specifically designed to affect employee benefit plans. [Citation.] We therefore conclude that the administrative order falls within ERISA's preemption clause." (*Ibid.*) (Italics added.)

Finally, the court concluded that ERISA section 514(d) did not save the order from preemption. (891 F.2d at pp. 730-732.) That section, codified at 29 United States Code section 1144(d), states that courts should not construe ERISA "to alter, amend, modify, invalidate, impair, or supersede any law of the United States. . . or any rule or regulation issued under any such law." In particular, the court rejected a claim that the state apprenticeship standards had been incorporated into the federal regulatory scheme under the Fitzgerald Act, 29 United States Code section 50.[9] (*Ibid.*) The court found that Fitzgerald Act did not "embod[y] a project in 'cooperative federalism' which will be 'impaired' or 'modified' within the meaning of section 514(d) if the administrative order against Hydrostorage were preempted by ERISA."[10] (*Id.* at p. 732.)

---

[9] That act provides: "The Secretary of Labor is authorized and directed to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, to extend the application of such standards by encouraging the inclusion thereof in contracts of apprenticeship, to bring together employers and labor for the formulation of programs of apprenticeship, to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship. . . ." (29 U.S.C. § 50.)

The court summarized: "These apprenticeship standards are set forth at 29 C.F.R. § 29.1-29.13 (1988). The regulations provide 'a detailed regulatory scheme defining apprenticeship programs and their requirements, and establish a review, approval and registration process for proposed apprenticeship programs administered by State Apprenticeship Councils under the aegis of the United States Department of Labor.' [Citation.]" (*Hydrostorage, supra,* 891 F.2d at p. 731.)

[10] In reaching its conclusion, the Ninth Circuit adopted the district court's reasoning. (*Hydrostorage, supra,* 891 F.2d at p. 731.) The district court summarized: " 'The Fitzgerald Act merely directs the Secretary of Labor "to formulate and promote the furtherance of labor standards . . . to safeguard the welfare of apprentices" and related objectives. 29 U.S.C. § 50. The implementing regulations state that their purpose is "to set forth labor standards to safeguard the welfare of apprentices, and to extend the application of such standards by prescribing policies and procedures concerning the registration, for certain Federal purposes, [of] acceptable apprenticeship programs." 29 C.F.R. § 29.1(b). Thus the regulations relate only to eligibility for federal registration. Neither they nor the Act itself contemplate enforcement mechanisms; Section 29.11 merely provides for the voluntary adjustment of complaints before either federal or state agencies. Assuming § 1777.5 was adopted in furtherance of the objectives of the Fitzgerald Act, it clearly is not an enforcement mechanism of federal law

Our extensive discussion of *Hydrostorage* demonstrates the great similarity between that case and the case before us. Both cases involve the attempt to enforce section 1777.5 and bind a nonsignatory employer to the terms of a collectively bargained apprenticeship trust fund and standards covered by ERISA. *Hydrostorage* found that ERISA preempted administrative enforcement of section 1777.5 under such circumstances. We find the Ninth Circuit's analysis persuasive and adopt its reasoning.[11]

The JAC attempts to distinguish *Hydrostorage* in several ways. First, it argues that its common law breach of contract action differs markedly from the administrative order in *Hydrostorage*. We disagree. Both actions seek to bind a nonsignatory employer to the terms of a collectively bargained apprenticeship trust fund and standards covered by ERISA. The complaint alleges the contract was entered into pursuant to the requirements of section 1777.5. We would exalt form over substance if we were to conclude that the JAC may enforce its standards and trust fund contribution requirements *indirectly* while the state could not enforce the same standards and trust fund contribution requirements directly.

Moreover, the action's common law origin gives the JAC no special immunity from ERISA's preemptive scope. ERISA expressly defines preempted "state laws" to include "decisions. . . of any State." (29 U.S.C. § 1144 (c)(1).) "State" includes any state "agency or instrumentality." (29 U.S.C. § 1144 (c)(2).) Thus, judicial decisions fit within ERISA's preemptive scope. Indeed, the United States Supreme Court has not hesitated to find state common law remedies preempted under ERISA. (See, e.g., *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 47-48 [95 L.Ed.2d 39, 47-48, 107 S.Ct. 1549] [ERISA preempted common law tort and contract claims for failure to pay insurance benefits].)

Second, the JAC notes that Weisscal signed the DAS 7 "agreement" while Hydrostorage did not. Again, we fail to perceive a meaningful distinction. As noted in *Hydrostorage*, ERISA preempts attempts under state law to enforce the terms of an ERISA plan. (*Hydrostorage, supra*, 891 F.2d at p. 730.) Like an administrative attempt to force an employer to sign a DAS 7 agreement, the common law attempt to enforce such an agreement

---

and to the extent orders under this section are preempted by ERISA, federal law is not impaired.' " (*Ibid.*)

[11] Contrary to Weisscal's suggestion, we are not bound to follow Ninth Circuit opinions. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 780, p. 751 ["the prevailing view appears to be that the decisions of the lower federal courts, although entitled to great weight, are not binding on state courts"].)

both "relates to" and "purports to regulate" an ERISA plan. It "relates to" an ERISA plan because the DAS 7 agreement specifically requires adherence to an ERISA plan, i.e., the applicable apprenticeship standards. (*Ibid.*) It "purports to regulate, directly or indirectly" an ERISA plan because it aims "[to compel] nonsignatory contractors to join or comply with such plans." (*Ibid.*) As such, we perceive no meaningful distinction between the two situations.

Similarly, we reject the JAC's argument that Weisscal is not an "employer" under ERISA. The JAC argues that since Weisscal is not an "employer" under ERISA, this case does not involve an ERISA employee welfare benefit plan. Rather, it claims that Weisscal is but a nonfiduciary plan service provider.

In *Hydrostorage,* the Ninth Circuit found it unnecessary to determine if that company was an "employer" under ERISA. We, too, find it unnecessary.[12] As in *Hydrostorage,* the case before us involves an ERISA employee welfare benefit trust fund and a set of apprenticeship standards. Since, under *Hydrostorage,* the apprenticeship standards are also ERISA welfare benefit plans, it becomes irrelevant whether the JAC seeks to enforce them against a non-ERISA employer. Or, rather, the very attempt to force a non-ERISA employer to adhere to ERISA plans triggers ERISA's preemptive impact. (891 F.2d at p. 730.)[13]

■ Finally, for the reasons given in *Hydrostorage,* we also reject the JAC's claim that the Fitzgerald Act has incorporated California apprenticeship standards into the federal apprenticeship standards regulatory scheme as a cooperative enforcement mechanism.

Our opinion does not condone ERISA's impact upon California's attempts to require all public works contractors to hire apprentices and support their training. But we must also conclude, with the Ninth Circuit, that complaints about ERISA's preemptive sweep belong only before Congress. (See 891 F.2d at pp. 728-729.)

■ Accordingly, we conclude that ERISA preempts a breach of contract action to enforce a DAS 7 agreement executed by an employer who had not signed the collective bargaining agreement that created the applica-

[12] In both the original and the first amended complaint, the JAC alleged that Weisscal *is* an ERISA "employer." Because we find it unnecessary to reach the issue, we also do not consider the legal impact of these allegations.

[13] Similarly, we need not rule whether the JAC is itself an ERISA employee welfare benefit plan. (See *Hydrostorage, supra,* 891 F.2d at p. 728.)

ble apprenticeship standards and trust fund. We express no other opinion on the preemptive impact of ERISA on section 1777.5.

### DISPOSITION

We affirm the judgment.

Puglia, P. J., and Sparks, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 25, 1990. Mosk, J., Broussard, J., and Kennard, J., were of the opinion that the petition should be granted.