**Gerald P. FIENE, et al., Plaintiffs,**

v.

**V & J FOODS, INC., et al., Defendants.**

No. 96–C–313.

United States District Court,
E.D. Wisconsin.

April 25, 1997.

Raymond M. Clark, Clark Law Office, Milwaukee, WI, Barbara J. Kraetsch, Kraetsch Law Offices, Wauwatosa, WI, for plaintiffs.

Jeffrey O. Davis, John W. Daniels, Jr., Lori L. Kaczynski, Quarles & Brady, Milwaukee, WI, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on defendants' motion for summary judgment. For the following reasons, the motion is granted and the case dismissed.

### I

V & J Foods, Inc. ("V & J" or "the Company") is a Wisconsin corporation primarily engaged in operating Burger King franchises. (Defendants' Proposed Findings of Fact ("DFOF") at ¶ 2; Plaintiffs' Challenge to Defendants' Proposed Findings of Fact ("PC") at ¶ 2; Daniels–Carter Dep. at 5.) Valerie

Daniels–Carter ("Daniels–Carter") is the President of V & J. (DFOF at ¶ 2; PC at ¶ 2.) On or about December 5, 1985, Gerald Fiene ("Fiene") was hired by V & J as a mid-level management employee. (DFOF at ¶ 6; PC at ¶ 6; Fiene Dep. at 13–15.)

V & J has an employee handbook and Fiene received a copy of this handbook when he was hired. (Fiene Dep. at 16–17.) In a section entitled "Benefits Programs and Policies", the handbook described the Company's medical insurance benefit:

### HOSPITALIZATION, SURGICAL, MEDICAL, AND MAJOR MEDICAL COVERAGE

To help reduce worry about expenses associated with sickness and accidents, V and J protects its employees with a Comprehensive Group Insurance Plan.

This plan includes: Hospitalization, Surgical, Medical, and Major Medical (Dental Optional).

After you have completed one (1) month of service, you and your family members are entitled to this insurance coverage. Your insurance premium is determined by your plan. There is a payment deduction from your check for your portion of the insurance coverage. However, V and J Foods pays for the majority of your insurance and administrative fees associated with your coverage.

(Davis Aff., Ex. 1 at 18.) Fiene received medical insurance for himself and his family under the foregoing provision. (Fiene Dep. at 18–23.) Fiene's contribution of $25.00–per–month was deducted from his paycheck

and the Company paid the remainder of the premium. (*Id.*) In 1987, however, the Company switched insurance plans. (*Id.*) Daniels–Carter told Fiene that he was rejected for coverage by the new plan because of preexisting conditions. (*Id.*) She then offered Fiene coverage under a separate plan administered by Wisconsin Health Organization ("WHO").[1] (DFOF at ¶ 7; PC at ¶ 7.) V & J purchased the WHO plan through a Multi–Employer Trust ("MET") called the Wisconsin Insurance Benefit Trust ("WIBT"). (*Id.*) As with his prior insurance, Fiene paid $25.00 a month—deducted from his paycheck—and the Company paid the remainder. (DFOF at ¶ 8; PC at ¶ 8.) Under the terms of the WHO plan, the premium for any given month became due on the 20th day of the preceding month. (DFOF at ¶ 9; PC at ¶ 9.)

In June, 1989, Fiene's wife gave birth to their second child, a son they named Christopher. (Fiene Aff. at ¶ 3.) Christopher had medical problems from birth and was diagnosed with cerebral palsy in December, 1989. (*Id.*) That same month, Fiene informed Daniels–Carter of Christopher's diagnosis. (Plaintiffs' Proposed Statements of Fact ("PFOF") at ¶ 12; Defendants' Response to Plaintiffs' Proposed Statement of Facts ("DR") at ¶ 12.) The following month, unknown to Fiene, V & J failed to make the January 20th payment for Fiene's medical insurance. (PFOF at ¶ 13; DR at ¶ 1.) Despite receiving past due notices, V & J failed to cure this default during the applicable grace period and the policy lapsed.[2] (PFOF

---

**1.** It is unclear whether Fiene was the only V & J employee insured under the WHO plan. There is evidence that another V & J employee—Reotha Cole—was also insured under the WHO plan, but the evidence is inconclusive at this point. (Plaintiffs' Ex. 4.)

**2.** The record is unclear as to why the premium was not paid. Fiene assumes the worst, suggesting that V & J deliberately stopped making payments once it learned—through Daniels–Carter—that Fiene's son had cerebral palsy. Fiene notes that in April of 1990 the Company was planning to put in place a "Cafeteria" benefits plan for it employees. (PFOF at ¶ 23; DR at ¶ 23.) Fiene suggests that V & J did not want his family involved in that plan and thus allowed his insurance to lapse, a theory he claims is supported by

the fact that he and his counsel first learned of the Cafeteria plan in January of this year. (PFOF at ¶¶ 23–24, 33; DR at ¶¶ 23–24, 33.) An April 13, 1990 letter written to WHO by V & J undercuts this theory, suggesting that the missed premium was the result of administrative oversight on V & J's part and requesting that WHO reinstate Fiene's insurance. (Plaintiffs' Ex. 4.) As for V & J's failure to respond to the past due notices it received during the applicable grace period, this could be further evidence of administrative incompetence on V & J's part, or further evidence of a secret intention to allow the policy to lapse. Daniels–Carter testified during her deposition that, although the past due notices were addressed to her, she does not see every piece of mail that comes into V & J with her name on it, particularly mail relating to accounts payable. (Daniels–Carter Dep. at 64, 68–72.) Such mail

at ¶¶ 14–15; DR at ¶¶ 14–15; Plaintiffs' Ex. 2.)

On March 3, 1990, Fiene began a five-day hospital stay for a knee injury. (DFOF at ¶ 10.; PC at ¶ 10.) In mid-March, 1990, as a consequence of costs associated with this hospital stay, Fiene learned from his physician that his medical insurance had lapsed. (*Id.*) Upon learning this, Fiene called V & J in March, 1990 and questioned Daniels–Carter and Raymond Lang, another V & J employee, about the problem with his insurance. (PFOF at ¶ 22; DR at ¶ 22; Fiene Dep. at 29–34.) Both said they knew nothing about the situation. (*Id.*) Roughly one month later, on April 13, 1990, in an apparent attempt to rectify the problem, V & J sent a letter to WHO bearing the facsimile signature of Daniels–Carter and requesting reinstatement of Fiene's policy, attributing the missed premium payment to administrative error on V & J's behalf. (Plaintiffs' Ex. 4; Daniels–Carter Dep. at 55–56.) WHO rejected that request. (Plaintiffs' Ex. 5.)

Fiene retained counsel on April 27, 1990. (Clark Aff. at ¶ 2.) On May 7, 1990, V & J—through Daniels–Carter—informed Fiene that she found two alternative insurance plans for him, but that he would have to pay the premiums for these plans while he was on medical leave. (DFOF at ¶ 12, Ex. B; PC at ¶ 12.) The letter did not admit, or even address, V & J's clear responsibility for the termination of Fiene's insurance. (*Id.*) Fiene spoke with the insurance agent for the plans and concluded that he could not afford the monthly premiums. (Fiene Dep. at 34–36.) On May 14, 1990, Fiene's lawyer sent a letter to V & J referencing the termination of Fiene's insurance policy and citing the fact that V & J failed to pay the requisite premium. (DFOF at ¶ 13, Ex. C; PC at ¶ 13.) The letter suggested holding a meeting "as soon as possible" in order to "find a solution" to Fiene's problem. (*Id.*) V & J's response was a letter from Daniels–Carter which again failed to address V & J's responsibility in the

matter and simply encouraged Fiene to get new insurance at his own expense. (Plaintiffs' Ex. 8.)

Inexplicably, it appears there was little additional communication between the parties for roughly two years, aside from perhaps a few telephone calls between counsel. (Clark Aff. at ¶ 5.) During this time, Fiene was unable to get needed medical treatment for his knee injury, could not return to work, and was eventually certified by the United States Social Security agency as being totally and permanently disabled. (PFOF at ¶ 18; DR at ¶ 18.) Fiene was placed on Social Security Disability in 1991, and his son Christopher was placed on Supplemental Security Income ("SSI") in 1990. (Fiene Aff. at ¶¶ 6–7.) However, Fiene's wife Angela and daughter Nicole were without insurance altogether. (*Id.*)

The next documented contact between the parties was a May 4, 1992 letter to V & J from Fiene's counsel referencing certain remedies available to Fiene under the Employee Retirement Income Security Act of 1974 ("ERISA") and requesting a copy of any Summary Plan Description. (DFOF at ¶ 15, Ex. E; PC at ¶ 15.) V & J, through its counsel, responded to this letter one month later, submitting a copy of the WHO member handbook and requesting an estimate of the medical expenses incurred by Fiene. (DFOF at ¶ 16, Ex. F; PC at ¶ 16.) Another month later, V & J's counsel sent a second letter to Fiene's counsel, expressing some frustration over his inability to get in touch with counsel, and again requesting a summary of Fiene's medical expenses and a response to an offer from V & J to reinstate Fiene's employment. (DFOF at ¶ 17, Ex. G; PC at ¶ 17.) Whether Fiene's counsel formally responded to this communication is unclear, but to the extent further discussions took place, it is clear that no settlement was reached. (DFOF at ¶ 18; PC at ¶ 18; Clark Aff. at ¶ 5; PFOF at ¶ 34; DR at ¶ 34.) Instead, on February 26, 1993, Fiene com-

was typically handled by an administrative assistant, who would also cut the checks on V & J's behalf, using a facsimile of Daniels–Carter's signature. (Id.) Thus, Daniels–Carter testifies she had no contemporaneous knowledge that Fiene's policy had lapsed and no current explanation for

why it lapsed. (*Id.* at 68–69.) The administrative assistant responsible for paying the insurance premiums in 1990 is obviously the critical witness in this regard, but the record inexplicably contains no testimony from this individual, or even clearly establishes who the individual was.

menced a lawsuit in federal district court "to toll the Statute of Limitations". (DFOF at ¶ 19, Exs. I & J; PC at ¶ 19.) The complaint invoked the court's federal question jurisdiction, citing the ERISA statute. (*Id.*)

The dispute could have been resolved by this first lawsuit. It was not, because Fiene's counsel failed to obtain proper service upon the defendants. Indeed, the only documented effort at "service" was a letter from Fiene's counsel to V & J's counsel dated June 26, 1993, exactly 120 days after the complaint was filed.[3] (DFOF, Ex. I.) The letter enclosed copies of the Summons and Complaint.[4] Curiously, the letter stated that "[u]nder the Federal Rules time remains to serve these papers", despite the fact that the 120–day period for service would end in two days.[5] (*Id.*) In any event, because Fiene's counsel failed to obtain proper service, the case was dismissed without prejudice for lack of prosecution. (DFOF at ¶ 20; PC at ¶ 20.)

Settlement discussions apparently broke off once this first lawsuit was dismissed. (PFOF at ¶ 38; DR at ¶ 38.) This is not surprising, given that the dismissal of the first lawsuit left any subsequent lawsuit vulnerable to a statute of limitations defense. Despite this breakdown, Fiene's counsel apparently took no further action until February 9, 1996—*almost three years after the first lawsuit was dismissed*—when he sent a letter to V & J's counsel stating that "Mr. Fiene still has claims arising out of contract that are not time barred, however, that time will soon expire." (Plaintiffs' Ex. 12.) The letter further itemized Fiene's medical expenses at $40,729.76 and indicated a desire "to explore ... the possibility of settling these claims." (*Id.*) V & J, through its counsel, rejected Fiene's claims and threatened to seek sanctions if Fiene's counsel went forward with the same. (Plaintiffs' Ex. 13.) Accordingly, on February 26, 1996, three years to the date after filing his first lawsuit, Fiene commenced a second suit, this time in state court. The complaint purported to raise various state law causes of action, but defendants removed the matter to federal court on grounds of federal question jurisdiction, asserting that ERISA provides the exclusive remedy for Fiene's claims. Fiene did

---

**3.** The record does not reflect when the letter was received by V & J's counsel.

**4.** The letter also enclosed copies of the federal "Notice and Acknowledgment of Receipt of Summons and Complaint" form "for [counsel's] signature". (*Id.* at I.) V & J's counsel did not sign these Acknowledgments, meaning that defendants would have to pay the costs associated with formal service. Formal service, however, was never accomplished.

**5.** June 26, 1993 fell on a Saturday, so counsel had until Monday, June 28, 1993 to serve the documents at issue. In any event, Fiene's counsel rationalizes this last-minute, ineffective attempt at service by stating "beyond doubt that he furnished [V & J's counsel] with a letter similar or the same as the one dated June 26, 1993 ... with the same enclosures, *well within the 120 day period for service of pleadings after commencement of an action.*" (Clark Aff. at ¶ 6; emphasis added.) First, whether or not he did so is immaterial, given that neither the June 26th letter, nor any similar letter sent prior to June 26th, would itself be effective service. Second, the current record does not support counsel's belief. Counsel fails to provide a copy of any letter(s) allegedly sent prior to June 26th. The June 26th letter itself states that "[w]e have exchanged correspondence on this matter in *1992*", suggesting that it was the first contact between the parties since the 1992 correspondence. (*Id.;* emphasis

added.) Counsel says his belief that a prior letter was sent is "strengthened" by the fact that June 26th was 120 days after commencement of the action. The Court does not understand how this fact supports his position. If counsel had sent the letter earlier, and failed to receive signed Acknowledgments from opposing counsel accepting service, one would not expect him to try this failed approach again two days before the service period expired. Rather, prudence suggests that counsel would abandon this approach and formally serve the defendants before service expired, especially given counsel's express acknowledgment that the lawsuit was filed "to toll the Statute of Limitations". Counsel also claims that his belief is "strengthened" by a July 2, 1 993 letter from John Daniels—a V & J shareholder and partner in the law firm representing V & J—responding to the June 26th letter. The letter states that Daniels was "surprised" to receive a copy of the June 26th letter, reminds counsel that "some time ago" V & J offered to reinstate Fiene, expresses a continued interest in resolving the dispute, and states Daniels' belief that V & J "has a high reputation for integrity." (Plaintiffs' Ex. 9.) The letter also states that neither Daniels nor his firm could accept service on V & J's behalf, suggests that Fiene's counsel dismiss the federal action, and further suggests that the parties "meet promptly to get this matter resolved." (*Id.*) The Court is at a loss as to how the foregoing supports counsel's claim that he sent a letter to opposing counsel prior to June 26th.

not object to this removal. Defendants now move for summary judgment.

The sudden resurrection of this dispute by the February 9, 1996 letter from Fiene's counsel was likely prompted, at least in part, by yet another tragedy for the Fiene family: Mrs. Fiene was diagnosed in early 1996 as having cancerous tumors throughout much of her body. (Fiene Aff. at ¶ 8.) Mrs. Fiene had been experiencing symptoms since 1992, symptoms which became more severe throughout 1993, 1994, and 1995. (*Id.*) She allegedly put off seeing a doctor because she had no insurance and the Fiene's were unable to afford appropriate medical testing. (*Id.*) She underwent chemotherapy and radiation treatment which ultimately proved unsuccessful. (*Id.*) She died a painful and agonizing death on December 22, 1996. (*Id.*) She was only 32 years old. Mr. Fiene, himself disabled, is thus left with the task of raising two children—one of whom is severely disabled by cerebral palsy—without a mother.

## II

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.*, at 327, 106 S.Ct. at 2555. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material]

fact claimed to be disputed." *Branson v. Price River Coal Company,* 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. Nor may "[a] party to a lawsuit ... ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge, . . . . '" *Palucki,* 879 F.2d at 1572 (7th Cir.1989). Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.,* 786 F.Supp. 607, 610 (S.D.Miss.1992).

### III

■ There are two issues on summary judgment. The first concerns whether or not ERISA preempts Fiene's state law claims. V & J argues that, despite the fact that Fiene's complaint asserts state law causes of action, the claims at issue relate to a "welfare benefit plan" covered by ERISA, and thus ERISA provides the sole basis for relief.[6] V & J argues further that Fiene's only ERISA claim is for breach of fiduciary duty under 29 U.S.C. § 1132(a)(2), and explains that such claims are subject to a 3–year statute of limitations which expired in 1993. For his part, Fiene does not dispute that his state law claims are preempted if they relate to a "welfare benefit plan", or that under ERISA his only claim is one for breach of fiduciary duty. Fiene only disputes V & J's assertion that the medical insurance provided by V & J constituted, or was part of, a formal "welfare benefit plan" for ERISA purposes. Fiene argues that V & J never formally reduced the "plan" to writing and that no one at V & J performed any meaningful administrative activity in connection with the so-called "plan". There being no formal ERISA "plan", Fiene argues, there can be no ERISA preemption.

■ ERISA recognizes a plan as a "welfare benefit plan" if it contains the following five elements:

(1) a plan, fund or program, (2) established or maintained, (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, ... or severance benefits, (5) to participants or their beneficiaries.

*Gupta v. Freixenet, USA, Inc.,* 908 F.Supp. 557, 562 (N.D.Ill.1995), quoting *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 738 (7th Cir.1986). There can be no dispute that elements (3), (4), and (5) are met in this case. The WHO policy was offered to Fiene by his "employer" in order to provide "medical benefits" to Fiene and his family as "participants" and "beneficiaries". *See, Peckham v. Gem State Mutual of Utah,* 964 F.2d 1043, 1047 (10th Cir.1992). Fiene essentially disputes the existence of the first two elements, *i.e.,* whether there was a "plan ... established or maintained" by V & J.

It is well-established that "[c]ourts must construe the definition of 'welfare benefit plan' broadly." *Gupta v. Freixenet, USA, Inc.,* 908 F.Supp. 557, 562 (N.D.Ill.1995), citing *Brundage–Peterson v. Compcare Health Services Ins. Corp.,* 877 F.2d 509, 511 (7th Cir.1989). "A plan need not be in writing to be covered by ERISA so long as the plan is a reality, meaning something more than a mere decision to extend benefits." *Diak v. Dwyer, Costello & Knox, P.C.,* 33 F.3d 809, 811 (7th Cir.1994). Courts ask whether the decision to extend benefits "constituted an expressed intention by the employer to provide benefits on a regular and long-term basis." *Id.,* quoting *Wickman v. Northwestern National Ins. Co.,* 908 F.2d 1077, 1083 (1st Cir.1990). "[T]he prevailing test for determining whether a 'plan' has been established within the meaning of ERISA" was set forth by the 11th Circuit in *Donovan v. Dillingham,* 688 F.2d 1367 (11th Cir.1982), and has been adopted by the 7th Circuit:

---

**6.** Only Fiene's initial complaint was limited to state law causes of action. After the matter was removed to federal court, Fiene submitted an amended complaint which added an ERISA claim, phrased by Fiene's counsel as a claim for "violation of federal law and a breach of fiduciary duty." (Amended Complaint at 8.)

In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits. *Diak,* 33 F.3d at 811–12, quoting *Donovan,* 688 F.2d at 1373. In applying this standard, the 7th Circuit notes that "[t]he [p]lan may adopt some of its essential provisions from sources outside itself", including "insurance policies that provide the [p]lan's funding." *Miniat,* 805 F.2d at 739.

Applying this test here, it is clear that V & J "established or maintained" a "welfare benefit plan" within the meaning of ERISA. The employee handbook given to Fiene at the time he was hired stated the Company's intention to provide "Hospitalization, Surgical, Medical, and Major Medical Coverage" as part of its "Benefits Program". The handbook stated that the benefit would be provided to all employees who "have completed one (1) month of service" and would extend coverage to the employee and the employee's family. The handbook further stated that the Company would pay the majority of the premiums and administrative costs associated with the insurance, but noted that an employee contribution would be deducted from the employee's paychecks. In addition, the WHO plan issued a "Member Handbook" which further detailed the exact coverages provided, the persons able to qualify for such coverage, and the procedures for receiving benefits and/or pursuing any grievances. (Plaintiffs' Ex. 14.) Nor can it be argued that V & J merely made a decision to extend benefits. V & J followed through on this intention, obtaining insurance and submitting premiums on behalf of Fiene and its other employees throughout the duration of their employment. Such efforts certainly evidence the "reality" of the plan and "constituted an expressed intention by the employer to provide benefits on a regular and long-term basis." The only exception to this long-standing practice was the missed insurance premium giving rise to the current dispute, and that lone mistake—intentional or not—does not destroy the existence of an ERISA plan.

The Court's conclusion draws support from the 7th Circuit's decision in the *Brundage–Peterson* case, cited *supra.* In that case, the employer entered into contracts with two insurance companies whereby those companies agreed to offer health insurance to its employees on the terms specified in the contracts. The insurance was made available to every employee who had been with the company for thirty days. Each employee was free to choose which of the two plans he or she preferred. The employer paid the worker's share of the insurance premiums, but the worker had to pay the share attributable to coverage for his or her dependents. The 7th Circuit summarized the plan's components as follows:

> So the "plan" (if that is what it was) had three components: the contractual arrangements between the employer and the insurance companies whereby the latter agreed to insure the former's employees; the eligibility requirement of being an employee of more than thirty days' standing; and the employer's contribution of the worker's share of the insurance premiums. The employer also collected and remitted the premiums that the workers themselves paid for their dependents; but that is done, as we have said, in many arrangements that are not ERISA plans.

*Brundage–Peterson,* 877 F.2d at 510. The plaintiff argued that the foregoing "plan" did not qualify as a "welfare benefit plan" under ERISA. The 7th Circuit disagreed, despite its description of the plan as "barebones":

> Is this rather barebones plan an ERISA plan? We think it is. The approach followed by the [employer] appears to be (with the sole and, we shall see, irrelevant exception of the presence of two insurers) a common method by which employers provide health and other welfare benefits to their employees, and not one that has heretofore been thought to take a benefits plan out of ERISA. The statute by its express terms encompasses the provision of such benefits by means of insurance, and once the employer elects that route his participation in the actual provision of the benefits is unlikely to be any greater than

the employer's in this case. If this employer's arrangement is less common than we suppose, it was the plaintiff's burden to enlighten the district judge and us by presenting evidence concerning the character of the various employee welfare benefit arrangements that are in force. An employer who creates by contract with an insurance company a group insurance plan and designates which employees are eligible to enroll in it is outside the safe harbor created by the Department of Labor regulation. This is especially clear when in addition, as was done here, the employer helps defray the employee's insurance cost, although from an economic standpoint there is little difference between payment nominally by the employer—which the employer will treat as a cost of employment, causing him to pay a lower wage than otherwise—and payment nominally by the employee.

*Id.* at 511. In so ruling, the 7th Circuit rejected a variable case-by-case approach similar to that advocated here by Fiene and based upon the level of the employer's involvement in the actual administration of the plan:

> The type of complicated, variable, case-by-case standard that the plaintiff advocates would create more uncertainty and litigation than the gain in substantive justice would warrant. Employers, employees, and insurance companies would have no clear idea whether their rights and obligations were defined by federal law or by state law. The contingent feature of a true welfare benefits plan, stressed in the Supreme Court's recent decision in *Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), is unaffected by the delegation of administration of the plan to an insurance company—a delegation in fact contemplated by the statute.

*Id.*

Fiene tries to distinguish *Brundage–Peterson* on grounds that the employer contracted directly with the insurance companies providing the insurance for its employees. Here, V & J did not contract directly with WHO. Rather, V & J subscribed to WIBT, a Multi–Employer Trust—often referred to as "MET's"—which in turn contracted with WHO for the purpose of providing insurance to the employees of its subscribers. MET's are fairly common. "A MET allows employers of relatively small numbers of employees to secure more favorable insurance rates by pooling their contributions." *Associates in Adolescent Psychiatry v. Home Life Ins. Co. of New York*, 729 F.Supp. 1162, 1179 (N.D.Ill. 1989). The MET accomplishes this by acquiring group health policies and accepting employers and unions as "subscribers", whereby the employees and/or members of these subscribers are pooled for purposes of obtaining coverage under the MET's various policies.[7] *Id.* In any event, Fiene argues that V & J's use of a MET to obtain his health insurance precludes any finding that such benefits were provided pursuant to an established "welfare benefit plan". He relies upon a line of cases beginning with *Taggart Corp. v. Life and Health Benefits Administration, Inc.,* 617 F.2d 1208 (5th Cir.1980). In *Taggart*, an individual formed a corporation, with himself as the only employee. The corporation in turn subscribed to a MET to obtain health insurance for this individual and his family. When a dispute arose regarding the denial of certain benefits, a lawsuit was filed under ERISA on behalf of both the corporation and the individual who formed the corporation. The defendants argued that the purchase of insurance for the single employee of a one-man corporation did not constitute a "welfare benefit plan" for ERISA purposes. Plaintiffs argued that the MET itself, and the employer's subscription thereto, constituted an ERISA "plan". The federal district court sided with the defendants, concluding that the circumstances evidenced no more than an individual's purchase of insurance for himself and his family under the guise of a corporate purchase. *Taggart Corp. v. Efros*, 475 F.Supp. 124, 127 (S.D.Tex.1979). The purchase lacked the requisite corporate intent to

---

7. Also, as happened here, a MET can sometimes serve to allow an employer who generally commits to providing insurance for all of its employees to obtain separate insurance for those few employees who may be poor insurance risks and/or who are not insurable under the employer's general group policy.

establish, maintain, and participate in a plan intended for the benefit of its employees. *Id.* The 5th Circuit agreed, further stating that neither the MET itself, nor the employer's subscription thereto, constituted a "welfare benefit plan":

> We agree with both the district court and the Secretary of Labor ... that [the MET] was neither established nor maintained by a statutory "employer" or "employee organization" ... and hence falls without the scope of ERISA.
>
> \*  \*  \*  \*  \*  \*  .
>
> While agreeing with the preceding conclusion, the Secretary of Labor urges us nonetheless to uphold federal jurisdiction in this case by declaring that Taggart Corp.'s subscription to [the MET] itself "established a single employer welfare plan." ... We reject this suggestion. Considering the history, structure and purposes of ERISA, we cannot believe that that Act regulates bare purchases of insurance where, as here, the purchasing employer neither directly nor indirectly owns, controls, administers or assumes responsibility for the policy or its benefits.

*Taggart,* 617 F.2d at 1210, 1211.

*Taggart* is thus frequently cited for the well-established proposition that a MET, by itself, does not qualify as a "welfare benefit plan" under ERISA, nor does the employer's subscription to a MET qualify as such a plan. *See, Donovan,* 688 F.2d at 1372, 1375; *Miniat,* 805 F.2d at 739–40. The reach of *Taggart* ends there, however. Subsequent courts have been careful to limit *Taggart's* holding to its unique facts. In *Donovan,* for example, the 11th Circuit held that "employers or unions that subscribed to [a MET] to furnish health insurance for employees or members (either pursuant to an agreement or pursuant to a continuing practice of purchasing the insurance for a class of employees) established employee welfare benefit plans." *Donovan,* 688 F.2d at 1374–75. As a successor court to the former 5th Circuit, it expressly limited *Taggart's* holding as follows:

> Although we agree with the holding in *Taggart,* we find the reasoning of the opinion that Taggart Corporation did not have a "plan, fund or program" encourages too

broad an interpretation. If *Taggart* is interpreted to mean ERISA does not regulate purchases of health insurance when there is no welfare plan, we agree. The purchase of insurance is only a method of implementing a plan, fund, or program and is evidence of the existence of a plan but is not itself a plan. If *Taggart* implies that an employer or employee organization that only purchases a group health insurance policy or subscribes to a MET to provide health insurance to its employees or members cannot be said to have established or maintained an employee welfare benefit plan, we disagree. To that extent *Taggart* shall no longer be binding in the Eleventh Circuit.

*Id.* at 1375. The 7th Circuit accepted this limitation of *Taggart* in the *Miniat* case, cited *supra,* which found the critical question to be whether the employer subscribing to the MET did so as part of an overall intent to provide insurance for its employees:

> At most the cases [*Donovan* and *Taggart*] suggest that, when the sole employee of a corporation, for that employee's own benefit or for that of his or her family, subscribes to a trust, the necessary intent on the part of the corporation to provide benefits for its employees may be lacking. Thus, although *Donovan* and *Taggart* are not controlling here, they do support the defendants' broader contention that we should examine the corporation's intent. In the case before us the corporation has, via a written agreement, established its intent potentially to provide benefits to all salaried employees. This is not a case, like *Taggart,* in which a corporation arguably failed to express the necessary intent. Thus, we do not believe that *Taggart* and *Donovan* require dismissal of the complaint.

*Miniat,* 805 F.2d at 741. Here, there is no doubt that V & J intended to provide medical insurance for its employees. It expressly stated that intent in its employee handbook and followed through by obtaining insurance on behalf of any employee who had been with V & J for at least one month. Thus, as in *Donovan,* V & J subscribed to WIBT to furnish insurance to Fiene "pursuant to an

agreement [and/or] a continuing practice of purchasing ... insurance for a class of employees."

The Court also draws support from the *Peckham* case, cited *supra*, where the 10th Circuit found the existence of an ERISA plan on facts virtually identical to those involved here. In *Peckham*, the employer subscribed to a MET and thereby obtained medical coverage for its employees. As here, the employer paid the majority of the insurance premiums, but deducted an additional premium from each employee's paycheck for coverage of each employee's dependents. The plaintiff argued that such an arrangement did not constitute a "plan" that was "established or maintained" by the employer under ERISA. The 10th Circuit disagreed, using language equally applicable here:

> With respect to AAA's provision of Gem insurance to AAA's employees, a reasonable person would determine that the intended benefit is medical coverage, that the intended class of beneficiaries is AAA's employees and, in the case of dependent coverage, their dependents, that financing comes from AAA with the possibility of supplemental financing from the employees if dependent coverage is requested, and that the procedures for receiving benefits are specified in the literature provided by IMET or Gem. Thus, AAA's plan is the type of "plan, fund, or program" contemplated by ERISA.

> \*      \*      \*      \*      \*      \*

> Given that AAA joined IMET in order to obtain insurance for its employees, purchased basic insurance from Gem for its employees, and listed insurance in its company manual as an employment benefit, AAA's plan was clearly part of its employment relationship with its employees. Thus, AAA's plan satisfies the "established or maintained" requirement.

*Peckham*, 964 F.2d at 1047–48, 1049. Fiene nonetheless argues that *Peckham* supports his position, insofar as he asserts that an ERISA plan does not exist unless there is an "ongoing administrative program" maintained by the employer. *Peckham* does state that an "ongoing administrative program is required", *Id.* at 1048, but does not set a very

high standard for the existence of such a program. The employer in *Peckham* met this requirement by the simple fact that "[its] program is ongoing. AAA must keep records and make regular payments to Gem. AAA also provides two people who act as liaisons between its employees and Gem, and in that capacity they serve to some extent as administrators." *Id.* Here, V & J's program of providing insurance for its employees was "ongoing". V & J made "regular payments" to WHO and its other insurers and "kept records" to facilitate and keep track of these payments. (See, Daniels–Carter Dep. at 24–26, 50–51, 69–71.) The only difference from *Peckham* appears to be the lack of a designated person to act as "liaison" between the employees and the insurers. However, someone at V & J obviously was responsible for collecting the premiums and forwarding payments to the insurers. (*Id.*) When Fiene's insurance lapsed, someone from V & J sent a letter to WHO in an effort to have Fiene reinstated. The Court does not believe the lack of a formal "liaison" takes this case outside of ERISA, especially when one considers that the 7th Circuit in *Brundage–Peterson* upheld the existence of a welfare benefit plan on facts showing the same "ongoing administrative program" that was shown here.

In short, V & J clearly and continuously expressed an intention to provide medical benefits to its employees, followed through on that intention by obtaining insurance for its employees (albeit, in at least one instance, through a MET), and made regular payments to the insurers on behalf of its employees. The parameters of this "plan" were generally stated in V & J's employee handbook and were further detailed in the Member Handbook issued by WHO. Nothing more is required to bring this "plan" within the scope of ERISA. Thus, Fiene's state law claims relate to a "welfare benefit plan" and are preempted by the federal statute.

## IV

■ Having determined that Fiene's only remedy is a claim under ERISA, the second issue is whether that claim survives a statute of limitations defense. V & J argues that

Fiene's only claim under ERISA is a breach of fiduciary duty claim under 29 U.S.C. § 1132(a)(2). Fiene, as stated earlier, does not quarrel with this assessment. In a breach of fiduciary claim under ERISA, a plaintiff "has six years after the 'breach or violation' in which to sue, or three years after the plaintiff 'had actual knowledge of the breach or violation,' whichever comes first, 'except that in the case of fraud or concealment, [the suit] may be commenced not later than six years after the date of discovery of such breach or violation.'" *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 850 (7th Cir.1996), citing 29 U.S.C. § 1113(a). Here, it is undisputed that Fiene had "actual knowledge" of V & J's failure to pay his insurance premium by May 14, 1990, the day his counsel sent a letter to V & J referencing the breach. Thus, V & J argues that, at the latest, Fiene had until May 14, 1993 to file his ERISA claim, or three years after his lawyer sent his initial demand letter.

Based on the record, it appears that Fiene's counsel initially concurred with this assessment. By his own admission he filed the first lawsuit—an ERISA lawsuit—in February of 1993 in order "to toll the Statute of Limitations". The only statute of limitations even close to expiring at that point was the 3-year statute governing fiduciary duty claims under ERISA. Nevertheless, counsel now argues that Fiene's claim is subject to the 6-year statute for cases involving "fraud or concealment". Counsel bases this claim on three alleged "facts". First, counsel claims that V & J initially hid the breach from Fiene when Ray Lang, a V & J employee, consistently told Fiene in March of 1990 that he had no idea what was going on with Fiene's health insurance. This statement was untrue, counsel argues, because V & J received notices concerning the lapsed insurance and sent a letter to WHO on April 13, 1990 acknowledging its mistake. Second, counsel states that John Daniels, a V & J shareholder and corporate officer, told counsel in 1992 that V & J wanted to be "fair" with Fiene and asked counsel to dismiss the first lawsuit so that settlement discussions

could continue. Counsel's "reliance" on these promises by Daniels was allegedly betrayed by V & J's unwillingness to discuss settlement once the case was dismissed. Third, counsel suggests that the failure to pay the premium was deliberate on V & J's part because the Company was planning on instituting a "Cafeteria" plan in the near future and wanted to eliminate the Fiene family because their son had cerebral palsy. In support of this theory, Fiene notes that neither he nor his counsel learned of the "Cafeteria" plan until January of this year.

■■■ The 7th Circuit describes the "fraud or concealment" phrase in § 1113 as "deeply puzzling". *Wolin*, 83 F.3d at 850. Nonetheless, the parameters of its application are fairly clear. It is well-established that the phrase "refers to steps taken by the defendant 'to hide the fact of the breach rather than to the underlying nature of plaintiffs' claim." *Radiology Center v. Stifel Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir. 1990). Thus, the "fraud or concealment" phrase "incorporates the fraudulent concealment doctrine" set forth at common law.[8] *Stifel*, 919 F.2d at 1220; *see also, Larson v. Northrop Corp.*, 21 F.3d 1164, 1172–73 (D.C.Cir.1994); *Kurz v. Philadelphia Electric Co.*, 96 F.3d 1544, 1552 (3rd Cir.1996). "Moreover, regardless of whether the acts to conceal the breach occur in the course of the conduct that constitutes the underlying breach or independent of and subsequent to the breach, '[t]here must be actual concealment—i.e., 'some trick or contrivance intended to exclude suspicion and prevent inquiry.'" *Larson*, 21 F.3d at 1173, quoting *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1095 (7th Cir.1992). "Concealment by mere silence is not enough." *Id.*, quoting *Martin*, 966 F.2d at 1094. Finally, like any fraud allegation, the allegations of fraudulent concealment must be pled with particularity and meet the requirements of Fed.R.Civ.P. 9(b). *Larson*, 21 F.3d at 1173; *Wolin*, 83 F.3d at 854.

---

**8.** The "fraudulent concealment" doctrine tolls the running of the statute of limitations when the defendant has prevented the plaintiff's timely discovery of the wrong he has suffered. *Stifel*, 919 F.2d at 1220.

Here, the Court first notes that Fiene failed to plead "fraud or concealment" in either his underlying complaint or the complaint filed in his first lawsuit, raising the issue for the first time in opposition to V & J's motion for summary judgment. Like the plaintiff in the Larson case, Fiene's counsel "apparently did not see this as a 'case of fraud or concealment' until he was faced with the very real possibility that his case might be barred by § 1113." *Larson*, 21 F.3d at 1173. A plaintiff cannot put off making particularized allegations of fraud until summary judgment. Such an approach would thwart the underlying purpose of Rule 9(b) and render it a nullity.

Second, the allegations that V & J kept secret its alleged intention to sabotage Fiene's insurance, and that Ray Lang failed to respond honestly to Fiene's inquiries about his insurance, allege nothing more than "concealment by mere silence", which is not enough to trigger the 6–year statute of limitations. Moreover, as to Lang, there is no evidence that, at the time he made the statements at issue, he was personally aware of the cause of Fiene's insurance problem. There is no evidence that he knew about the notices which V & J received from WHO, or that V & J sent a letter to WHO on April 13, 1990 admitting that it failed to pay Fiene's premium. Thus, there is no evidence from which the jury could conclude that Lang's statements were false.[9] Even if Lang had some knowledge as to Fiene's insurance situation, the Court would be hard-pressed to term his responses to Fiene as "some trick or contrivance intended to exclude suspicion and prevent inquiry." Fiene was sitting in the hospital in need of treatment. He already knew that his medical insurance had lapsed and that V & J was responsible for making sure the premiums were paid on a timely basis. Thus, he was already inquiring about the breach. Fiene knew there was a problem and already suspected that V & J was the source of that problem. Under those circumstances, a statement by Lang pleading ignorance can hardly be expected, or even intended, to "exclude suspicion and

prevent inquiry." If anything it *heightened* suspicion and inquiry, as evidenced by Fiene's decision to retain counsel shortly thereafter.

Finally, the statements by John Daniels that the Company wanted to be "fair" with Fiene and suggesting that Fiene's counsel dismiss the first lawsuit in order to facilitate settlement, even if disingenuous, did not serve to hide the fact of V & J's breach. Nor did Fiene's counsel rely on the same. Reliance implies that Fiene's counsel voluntarily dismissed the first lawsuit in anticipation of a promised settlement. He did no such thing. The federal judge assigned to the case dismissed the matter for lack of prosecution based on counsel's failure to obtain service in a timely manner. Counsel's argument is thus itself disingenuous.

Accordingly, Fiene's claims must be rejected. By dismissal of this lawsuit, the Court does not mean to minimize the real tragedies and injustices which have been visited upon Mr. Fiene and his family over the course of this dispute, but the law provides him no succor.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Defendants' motion for summary judgment is granted and the case dismissed.

---

**9.** In this regard, the Court is surprised to find no testimony from Lang in the record, either by way of affidavit or deposition.