Patricia J. JOHNSTON,
et al., Plaintiffs,

v.

GARDEN STATE MEDICAL GROUP,
P.A., et al., Defendants,

and

Garden State Medical Group, P.A.,
Third–Party Plaintiff,

v.

Hip Of New Jersey, Inc., d/b/a Hip
Health Plan Of New Jersey
Third–Party Defendant.

No. CIV. A. 98–4593(JBS).

United States District Court,
D. New Jersey.

Aug. 22, 2000.

Joseph J. Ayella, Stephen G. Console, Law Offices of Stephen G. Console, Westmont, NJ, Yvonne R. Haddad, The Mager Law Firm, P.C., Delran, NJ, for Plaintiffs.

Frank R. Ciesla, Craig S. Virgil, Giordano, Halleran & Ciesla, Middletown, NJ, for Defendants.

## OPINION

SIMANDLE, District Judge.

In this action, a certain group of former employees ("Former Employees" or

1. The current plaintiffs, after the filing of the Second Amended Complaint, are: Patricia J. Johnston, Catherine Ann Bailiff, Darlene P. Jones, Marian R. Benedicto, Noreen Negron, Colleen L. Hudgins, Hamid Moussavian, Margaret M. Tedesco, Paul Follansbee, Judith S. Brauner, Francis E. Tubens, Diane Gottlieb,

"plaintiffs") have brought claims, on behalf of themselves and similarly situated individuals, alleging that defendant Garden State Medical Group, P.A. ("GSMG") improperly failed to give them severance when terminating their jobs when third party defendant H.I.P. of New Jersey, Inc. d/b/a HIP Health Plan of New Jersey ("HIP") solicited GSMG's employees, in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* and various aspects of New Jersey tort law. Now before this Court are the parties' cross-motions for summary judgment. Defendant GSMG argues that it is entitled to summary judgment on plaintiffs' ERISA and state law claims because plaintiffs had no contractual or other right to severance pay. Plaintiffs argue that summary judgment should be granted against GSMG and its fiduciaries because they are entitled to severance benefits under the clear language of GSMG's severance plan.

For the reasons that follow, plaintiffs' motion for summary judgment will be denied and defendant's motion for summary judgment will be granted. Accordingly, this case will be dismissed. Additionally, the Court will administratively terminate GSMG's Third Party Complaint against HIP for indemnification.

## I. BACKGROUND

### A. Procedural History

Plaintiffs[1] filed this lawsuit for severance benefits under ERISA on October 5,

Noel Fitzpatrick, Wendy Redman Jones, Ann Mancuso, Howard Friedman, Brian Ford, John Weagley, Mireille Rosenbaum, Carol Salas, Mary Vallely, John Hudome, and Patricia A. Soto. Stipulations to dismiss former plaintiff Ann M. Chicchi, Elsie Diaz, Ann King, and Jeff Leroy were filed October 14, 1999.

1998. GSMG filed an Answer and Third–Party Complaint against HIP for indemnification.[2] On December 22, 1998, plaintiffs amended their Complaint to add additional plaintiffs. On May 10, 1999, the plaintiffs requested and received permission to further amend their Complaint to add additional counts. GSMG filed Answers to the Amended Complaint and Second Amended Complaint, and left the Third–Party Complaint untouched.

On January 14, 1999, this Court entered an order staying the third-party complaint against HIP (the "Stay Order"). As set forth in the Stay Order, the order of rehabilitation entered in the matter of *LaVecchia v. HIP of New Jersey, Inc.*, 324 N.J.Super. 85, 734 A.2d 361 (1999) (which placed HIP in rehabilitation and stayed state litigation against HIP) was given due consideration in connection with the court's decision to stay this proceeding as to HIP. The Stay Order has not been lifted.

Plaintiffs' Second Amended Complaint is written in three counts. Count I asserts a claim against defendants GSMG and its fiduciaries for failure to pay severance benefits in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B). Count II asserts a claim against the same defendants for violation of 29 U.S.C. § 1104 and 1105 for breach of fiduciary duty to speak truthfully. Count III asserts a claim against the same defendants for breach of contract and the covenant of good faith and fair dealing.

Following the close of discovery, the parties filed cross-motions for summary judgment, which are now before this Court. This Court has original jurisdiction over Counts I and II pursuant to 28 U.S.C. § 1331, as they both allege violations of federal law. The Court has supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367. For the reasons expressed herein, plaintiffs' motion will be denied, defendant's motion will be granted, and judgment will be entered in favor of GSMG and against plaintiffs. Additionally, because the stay of the Third Party Complaint still stands, in light of the dismissal of plaintiffs' Complaint, the Court will direct the Clerk to administratively terminate the Third Party Complaint.

**B. Relationship Between HIP and GSMG**

In January of 1996, an entity also known as Garden State Medical Group, P.A. (the "Old Garden State") merged into the Central New Jersey Medical Group, P.A. ("CNJMG"), forming the organization known now as GSMG. Until December 31, 1996, GSMG, along with its network of community physicians, was the exclusive provider of medical services to the members of HIP, a federally-qualified health maintenance organization ("HMO"). (Lenz Certif. ¶ 3.) GSMG's physicians provided medical care to HIP's members at each of the health centers owned by HIP throughout the State of New Jersey. (*Id.*) Although the health centers were owned by HIP, they were staffed and managed by GSMG. (*Id.*) GSMG also managed, developed, and contracted with a certain network of community physicians, who provided care to those of HIP's members who received care outside of the health centers. (*Id.*) GSMG also performed certain administrative functions on behalf of HIP, which

---

**2.** In its brief, GSMG describes its Third Party Complaint as thus: "GSMG has set forth that the termination of each one of the plaintiffs was caused by HIP and, without conceding that GSMG is liable to the plaintiffs for the payment of severance, GSMG has also set forth that any severance payments due to the plaintiff are owed by HIP." (GSMG's Br. Supp. Summ. J. at 2–3.) This is the essence of a claim for indemnification.

HIP was required to perform as an HMO. (*Id.* at ¶ 4.) In order to perform those functions and treat HIP's nearly 200,000 members, GSMG employed approximately 200 staff physicians and 1,600 non-physician and administrative personnel. (*Id.*)

The relationship between GSMG and HIP was governed by a written contract known as the "Medical Services Agreement." (*Id.* at ¶ 5.) The final Medical Services Agreement ("MSA") was executed as of January 1, 1995 and, by its terms, expired on December 31, 1996. (*Id.*) The M.S.A. was a cost-plus contract and essentially set forth that GSMG was to provide medical care and other related functions. (*Id.* at ¶ 6.) In exchange, HIP was to fund the payment of any and all expenses that GSMG incurred in connection with its performance under the MSA. (*Id.*) HIP also funded the employer-related expenses that GSMG incurred in connection with its performance under the MSA, including all salary and compensation that GSMG paid to its employees. (*Id.*)

The relationship between HIP and GSMG, which was a continuation of the relationship HIP had with GSMG's predecessors, was a joint enterprise—GSMG provided all staff and physicians and took care of administrative functions, and HIP paid all of the salaries and expenses. In particular, HIP and GSMG executives formed joint committees and regularly attended meetings together. (*Id.* at ¶ 8.) All meetings and committees were aimed at fostering and enhancing the economic development of the joint enterprise. (*Id.*) Both HIP and GSMG's employees, many of whom worked side-by-side, viewed HIP and GSMG as a single unified entity. (Arora Dep. 84:4—85:10.)

### C. *Events Leading to Lawsuit Between GSMG and HIP*

During 1995 (prior to GSMG's contract with HIP), HIP dramatically reduced premiums due to the substantially increased competition in the HMO marketplace, and in order to try to regain some of its lost market share. (Lenz Certif. ¶ 10.) Despite this reduction and the offering of additional products, HIP's enrollment was substantially behind budget for that year and dropped precipitously throughout 1996. (*Id.*)

Aware of HIP's financial downward spiral, GSMG became concerned that if it was to have any long-term future and continue to service the needs of HIP, some changes were called for in the way in which business was conducted. (*Id.* at ¶ 11.) GSMG approached HIP with the suggestion of reconsidering the requirement that GSMG exclusively service HIP's members. (*Id.*)

Rather than accede that suggestion, beginning in the summer of 1996, HIP began to aggressively solicit GSMG's workforce. (*Id.* at ¶ 2.) First, HIP solicited GSMG's physicians. (*Id.* at ¶ 3.) Then it turned its efforts to GSMG's non-physician employees, many of whom had been HIP employees in the early 1990's prior to the transfer of jobs and employees by HIP to either CNJMG or the Old Garden State. (*Id.* at ¶¶ 14–18.) By August, thirty GSMG employees had been solicited away from GSMG. (*Id.*)

### D. *Filing of the Chancery Court Action*

GSMG then commenced a lawsuit in the Superior Court of New Jersey, Chancery Division, Middlesex County, for the purpose of derailing HIP's efforts to hire away all of GSMG's employees. (Virgil Certif. ¶ 13.) GSMG filed a motion for an order to show cause to obtain temporary and preliminary restraints enjoining HIP from, among other things, hiring away GSMG's workforce. (*Id.*) The chancery court entered an order dated August 9,

1996 (the "August Order"), which imposed various temporary restraints upon both parties aimed at maintaining the status quo until the return date of GSMG's order to show cause. (Virgil Certif. Ex. B, ¶ 4.) This included a restraint on HIP's solicitation or hiring of GSMG employees. (*Id.*)

On August 28, 1996, HIP filed a motion on short notice to vacate the portion of the August Order which prohibited HIP from hiring or soliciting GSMG's employees. (Virgil Certif. ¶ 5.) HIP argued that it needed to immediately hire GSMG's employees so that it could put a replacement health care delivery system in place. (*Id.*) GSMG vigorously opposed HIP's motion, arguing that it needed its employees to maintain the integrity of its organization so that it could continue to survive after the M.S.A. expired on December 31, 1996. (*Id.*) In addition, GSMG attempted to illustrate to the chancery court that HIP was seeking to take over GSMG gratis, without its leadership, and was seeking to destroy GSMG as a potential source of competition. (*Id.*)

On September 11, 1996, the chancery court ruled that HIP could begin to hire GSMG's employees to commence employment after the expiration of the M.S.A. (as of January 1, 1997) (the "September 11th Order"). (*Id.* at ¶ 6.) The chancery court also ordered that the parties once again appear on September 24, 1996, for the purpose of discussing how to accomplish an orderly transition once the M.S.A. expired. (*Id.*)

GSMG and HIP were unable to come to an agreement concerning an orderly transition. (*Id.* at ¶ 7.) The disagreement centered upon HIP's insistence that HIP be permitted to hire GSMG's employees beginning October 1, 1996, three months before the M.S.A. was set to expire. (*Id.*) The chancery court acknowledged GSMG's argument that the premature hiring of GSMG's employees would irreparably injure and destroy GSMG, thereby precluding GSMG from having a future beyond December 31, 1996, but nonetheless granted HIP's application in full. (*Id.* at ¶ 8.) By way of an order dated September 27, 1996 (the "September 27th Order") (*id.* at Ex. A), the chancery court said as follows:

1. As of October 1, 1996, HIP is permitted to assume and to commence performing, in the place and stead of GSMG, the functions and services in the following areas that heretofore were provided under the Agreement by GSMG: (a) quality/ utilization management; (b) maintenance of medical records; (c) case management including Triage and Lifestarts; and (d) operation of all business offices, security services and receptionist.

2. In connection with HIP's performance of the functions and services set forth in paragraph 1, HIP is permitted to recruit and to hire, effective October 1, 1996, those GSMG employees who are performing the same functions and services under the Agreement.

3. Any claims in this action for breach of contract and/or money damages are not affected by this Order and are hereby preserved.

4. The restraints set forth in Paragraph 2(b) of the Orders dated August 9, 1996 and August 15, 1996 are hereby vacated and HIP may solicit and hire any at-will GSMG employees to commence immediate employment as HIP employees.

5. The restraints contained in Paragraph 7 of the Court's Order dated September 3, 1996 are hereby vacated.

\* \* \* \* \* \*

(*Id.*)

GSMG immediately obtained a stay of the September 27th Order to file a motion

for leave to file an appeal with the Superior Court of New Jersey, Appellate Division. (Virgil Certif. ¶ 9.) GSMG's motion for leave to appeal was ultimately denied. Subsequently, GSMG filed a petition for certification with the New Jersey Supreme Court, but that was denied as well. After fully exhausting its rights of appeal, the stay entered in connection with the September 27th Order was lifted.

E. *The Hiring Process*

According to Peter Hamarich, who was Manager of Human Resources for HIP during the relevant time period, while the chancery court action was pending, HIP developed a strategy of identifying and hiring GSMG's employees who were responsible for performing the jobs and functions attendant to the management and operation of the healthcare delivery system. (Hamarich Certif. ¶ 5.) When the temporary restraints were vacated in the fall of 1996, HIP immediately recommenced its efforts to identify and hire GSMG employees. (*Id.* at ¶ 6.) As a part of that process, HIP's Human Resources Department established the following tasks and procedures: (1) teams were established in order to identify and contact GSMG employees, (2) a phone bank was established in order to field phone calls from GSMG employees who expressed an interest in commencing employment with HIP (as a part of that process, a database was created to document the identities of GSMG employees who contacted HIP concerning employment, and a master list was established from that database which allowed HIP to determine whether its hiring needs had been fulfilled), and (3) certain persons from HIP's Human Resource Department worked along with former GSMG employees in order to further identify and target GSMG employees who were to be hired by HIP. (*Id.*) In some cases, former GSMG and even current GSMG employees provided HIP with lists of names of GSMG employees who were desirous of commencing employment with HIP. (*Id.*)

HIP viewed this hiring process as a "light switch transaction," meaning that the identification and hiring of GSMG's employees was done on an extremely accelerated basis. (*Id.*) As HIP identified and targeted GSMG employees, those employees were provided with offers of employment and were later hired by HIP. (*Id.*) Upon being hired, GSMG's former employees attended orientation sessions conducted by HIP's Human Resources Department. (*Id.*)

The offers came in the form of a "form letter" from Ann Behringer, the previous director of Human Resources for HIP. (*Id.* at ¶ 8 and Ex. A.) Offer Letters were sent to those GSMG employees who made known to HIP their intention to work for HIP; because HIP did not have a master list of GSMG employees, HIP could not have sent an Offer Letter to anyone who did not advise HIP of his or her desire to work for HIP. (*Id.*) By way of the Offer Letter, GSMG's employees were provided with offers of employment, which could be accepted by merely signing the Offer Letter and returning the executed letter to HIP. (*Id.*) Letters began by stating:

> In response to your application for employment, I am please to confirm an HIP position for you effective January 1, 1997. It is important that you respond promptly so we know that you are interested in joining HIP and can include you in future communications and other employment related activities (i.e., training, orientation, etc.). Additionally, we will recognize your years of service with Garden State Medical Group for vacation and pension vesting purposes.

(*Id.* at Ex. A.) The letter further noted that "At this time, we cannot hire you to begin work for HIP prior to 1/1/97. However, please indicate the earliest date you would like to commence employment, assuming we can accommodate an earlier start." (*Id.*)

HIP's hiring of GSMG's non-physician staff was completed by the end of November 1996. (*Id.* at ¶ 9.) When the hiring process ended, HIP had hired all of GSMG's administrative staff, with the exception of approximately ten people. (Lenz Certif. ¶ 23.) More specifically, HIP hired nearly 1,600 non-physician employees. (*Id.*) Left with only ten employees, GSMG continued with its few remaining functions until December 31, 1996, when the M.S.A. expired, and at that point GSMG terminated the ten employees. (Lenz Certif. ¶ 26.) After December 31, 1996, GSMG began the process of dissolving itself, and it remains a corporation in dissolution. (*Id.* at ¶ 27.)

Nearly one-half of the Former Employees communicated an interest in working for HIP as early as August 22, 1996, while GSMG was still in court attempting to prevent HIP from taking over its organization and when the August Order was still in place prohibiting HIP from hiring GSMG's employees. By way of a certain interoffice memo dated August 22, 1996 (the "August Memo") to Patricia Jackson, an HIP employee, 17 of the Former Employees formally applied for employment with HIP. (Virgil Certif. Ex. H, at ¶ 13.) [3] The memo was drafted by Karen Calandra within hours after being urged by GSMG's President, Paul R. Lenz, M.D. ("Dr. Lenz"), to remain loyal to GSMG and refrain from joining HIP. (Calandra Dep. 84:12—85:17.) Others of the Former Employees also expressed an interest, prior to September 19, 1996, in working for HIP. [4] (Behringer Certif. ¶¶ 6–7 and Ex. A.) At the time, GSMG was still in court attempting to prevent HIP from hiring them.

Each of the Former Employees submitted formal applications for employment with HIP (Virgil Certif. Ex. D), some as late as December 2, 1996, [5] and each Former Employee also accepted employment with HIP insofar as each Former Employee executed and returned the Offer Letter to HIP. (*Id.* at Ex. C.) [6] In numerous

3. Those Former Employees are Patricia Johnston, Karen Calandra, Francis Tubens, Hamid Moussavain, M.D., Noreen Negron, Mirielle Rosenbaum, John Hudome, Diane Gottlieb, Wendy Jones, Noel Fitzpatrick, Paul Follansbee, Peggy Tedesco, Darlene Jones, Marian Benedicto, Brian Ford, and Colleen Hudgins.

4. Those Former Employees include Catherine Bailiff, Ann Newswanger, May Jane Pfeiffer, Carol Rowe, Mary Ann Soto, Gina Teti, Rose Teti, Francis Tubens, Becky Vallely, and Dorothy Weatherbee.

5. The dates of application are as follows: Marilyn Arora, Nov. 7; Catherine Bailiff, Sept. 18; Marian Benedicto, Oct. 15; Patricia Blanco–Gonzales, Sept. 20; Mary Fitzpatrick, Nov. 6; Paul Follansbee, December 2; Brian Ford, November 4; Howard Friedman, Oct. 16; Colleen Hudgins, Oct. 1; John Hudome, Oct. 18; Patricia Johnston, Nov. 4; Wendy Jones, Oct. 17; Darlene Jones, Sept. 24; Noreen Negron, Nov. 4; Ann Newswanger, Sept. 25; Mary Jane Pfeiffer, Sept. 23; Carol Rowe, Sept. 30; Patricia Soto, Sept. 20; Carol Salas, Sept. 30; Margaret Tedesco, Oct. 17; Gina Teti, Sept. 26; Rose Teti, Sept. 23; Frances Tubens, Sept. 23; John Weagley, Oct. 17; Dorothy Weatherbee, Sept. 23.

6. The dates of acceptance are as follows: Marilyn Arora, Oct. 1; Catherine Bailiff, Sept. 18; Marian Benedicto, Oct. 15; Patricia Blanco–Gonzales, Sept. 20; Judith Brauner, Oct. 15; Mary Fitzpatrick, Nov. 6; Paul Follansbee, Oct. 24; Brian Ford, November 4; Howard Friedman, Oct. 16; Colleen Hudgins, Sept. 20; John Hudome, Oct. 18; Patricia Johnston, Nov. 4; Wendy Jones, Oct. 17; Darlene Jones, Sept. 24; Noreen Negron, Nov. 4; Ann Newswanger, Sept. 25; Mary Jane Pfeiffer, Sept. 23; Mierelle Rosenbaum, Oct. 21; Patricia Soto, Sept. 20; Carol Salas,

instances, the letters of acceptance were executed prior to the filing of an application itself. All Offer Letters to the Former Employees listed January 1, 1997 as a start date. (*Id.*) Some of the Former Employees did not respond at all to HIP's printed question as to the earliest date on which they would like to commence employment if a date earlier than January 1, 1997 could be accommodated, or they physically wrote in January 1, 1997. (*Id.*) Others checked "ASAP."[7] (*Id.*) Almost without exception, each Former Employee stated that the only change he or she experienced in connection with the switch in employment was the name on the paycheck; the Former Employees experienced no change in duties, amount of pay, work, worksite, or benefits. Additionally, any GSMG employee whose termination was a result of position elimination or who was laid off during his or her employment with HIP was eligible for benefits under HIP's severance practice (permitting all non-managers two weeks of severance for each year of service, and three weeks a year for managers, up to a maximum of twenty-six weeks, including in that calculation the years of service with GSMG.) (Hamarich Certif. ¶ 12.)

### F. HIP's Termination of the Former Employees

All of the GSMG employees who went to work for HIP (except Karen Calandra and Ann Mancuso, who both resigned from HIP) were terminated in November 1997 when HIP's health centers were sold to Pinnacle Health Enterprises, Inc. ("PHE"). (Hamarich Certif. ¶ 13.) Those employees were advised that they would be eligible for severance under HIP's policy if certain criteria were met. (*Id.*) Any severance that would have been provided would have been based upon a calculation for a period that began from the employee's initial date of hire with GSMG or any "predecessor" entities. *Id.* About 155 employees were eligible for severance, but none of the Former Employees met HIP's criteria for payment of severance benefits. (*Id.* at ¶ 15.)

When HIP's health centers were sold to PHE, the responsibility for managing and operating those centers was assumed by PHE. (*Id.* at ¶ 14.) The sale of HIP's health centers also involved the elimination of positions relating to the management and operation of those centers. (*Id.*) Among the positions that were eliminated by HIP were the jobs belonging to the GSMG employees who HIP had hired, including the jobs belonging to the Former Employees. (*Id.*)

### G. The Former Employees' Claims for Severance

Before filing this lawsuit, the Former Employees never requested severance benefits from GSMG. (Lenz Certif. ¶ 24.) No other employees have requested severance from GSMG. (*Id.*) According to Patricia Johnston, lead plaintiff, she first began her quest to obtain severance when she was employed by PHE. (Johnston Dep. 13:4—15:23.) She testified that she was told that if she did not take the job with PHE, she would be out of a job with HIP with no severance. (*Id.*) Her initial focus was to pursue HIP for severance benefits. (*Id.*) After learning from her attorneys that doing so would not be a possibility

---

Sept. 26; Margaret Tedesco, Oct. 17; Gina Teti, Sept. 26; Rose Teti, Sept. 20; Frances Tubens, Sept. 21; Mary Vallely, Sept. 28; John Weagley, Oct. 17; Dorothy Weatherbee, Sept. 23.

**7.** The following Former Employees checked "ASAP": Catherine Bailiff, Colleen Hudgins, Darlene Jones, Mary Jane Pfeiffer, Patricia Soto, and Dorothy Weatherbee.

(due to the fact that HIP was in liquidation), her focus turned to pursuing severance from GSMG. (*Id.*) The Former Employees' claim that their jobs were abolished and that they are therefore entitled to severance from GSMG is based on a letter dated October 7, 1996 and a document alleged to be GSMG's Severance Policy.

The October 7, 1996 memorandum was sent by Gerald Miller, who was, at the time, Senior Director of Organizational Development for GSMG; though a high ranking employee, Miller was not an officer of GSMG. (Miller Dep. 8:8–11.) Miller sent a memorandum to employees working in case management, life starts, triage (evening/weekends), quality/utilization management, business office, receptionists, security services, medical records (excluding health information) which read as follows:

As you know, under a Court decision, management of the above functions will be assumed by HIP effective Monday, October 7 at 4:00 p.m. unless stayed by the Court.

HIP has notified us that they will no longer reimburse GSMG for expenses associated with these functions, including salaries, after 4:00 p.m. today.

Unfortunately, as of early afternoon today, we do not yet know who HIP has hired and who they haven't. For this reason, I have no alternative but to have this letter delivered to all GSMG employees in the above listed functions. I regret to my having to advise you in this way, but if you have not been hired by HIP as of 4:00 p.m. today, you will be laid off. You are not to show up for work after 4:00 p.m. today.

As soon as I am advised who is hired by HIP and who is not, I will send the appropriate information packets to each of you.

For those of you who are being laid off, the packet will include information on the severance and vacation pay issue. . . .

Once again, I apologize for notifying you in this manner. For those of you being laid off, please file for Unemployment Compensation at your earliest convenience. . . .

On behalf of GSMG, I want to thank each of you for your service and contribution to GSMG and the patients we have been serving.

(Pls.' Ex. 8.) As Miller testified in his deposition, no severance packets were actually sent out because everyone was hired by HIP, HIP "took them all" without the need to apply. (Miller Dep. at 98:11–20.) Miller explained that "the jobs were not eliminated, these people were laid off. . . . They were consumed." (*Id.* at 129:7–11.) His letter meant that if HIP offered a job to a GSMG employee and that employee turned down the job offer, the employee would not get severance from GSMG because, in effect, the employee had quit. (*Id.* at 130:11–15.) Those employees not hired by HIP, however, would be fired, and would have been eligible for severance because GSMG was "abolishing" their jobs due to inability to pay them. (*Id.* at 132:15–18; 133:12—134:2.)

According to Miller, and according to the plaintiffs, the severance to which any GSMG employee not hired by HIP would have been entitled would be determined by a Severance Policy which Miller had drafted.[8] The Severance Policy is a five page

**8.** The parties hotly debate whether the Severance Policy was official policy of GSMG in October of 1996. Plaintiffs point to testimony by Gerald Miller that he drafted the policy for use at another point during the year, that the policy had been approved by the Board of

document which is marked as being "[e]ffective January 1, 1996." (Pls.' Ex. 4.) The Severance Policy provides that

2) **Severance Pay**

Any severance pay for job abolishment cases is measured by the employee's length of full-time/part time service and in accordance with the schedule in Attachment A. Severance pay will be on a regular payroll schedule until the full amount of severance is paid out. Basic leave accruals (30 day maximum) will be paid at the end of the severance period.

(*Id.*) Paragraph Five of the Severance Policy provides that where a job is abolished, GSMG should try to find a "suitable position" (described as having the same or higher grade level and the same or higher salary, using the same general skills, and being not more than 20 miles further or 45 minutes longer each way from the employee's home) for the employee "in another region within the GSMG," and refusing a suitable offer precludes payment of severance benefits. (*Id.*) Paragraph Eight of the Severance policy explains that "[e]mployees whose jobs have been abolished, and who is not provided with a suitable job offer, will be eligible for severance pay determined as of the date of notice." The first paragraph explains that "Authority to approve non-physician job abolishments is delegated to the Regional Medical Director or Department Chief in consultation with the Senior Director, Organization Development and/or Director of Employee Relations."

Although the Severance Policy does not contain a definition of when a job is abolished, the fourth paragraph of the Severance Policy sheds light on its meaning by referring to "[w]hen jobs must be abolished at a work site because the function is eliminated or fewer employees are needed to perform a given function. . . ."

## II. DISCUSSION

### A. *Summary Judgment Standard of Review*

A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding whether there is a disputed issue of material fact the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080–81 (3d Cir.1996). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact

---

GSMG (including Dr. Lenz), and that it was still in effect in October of 1996, as well as to evidence that at various other points during the year a few other employees received severance from GSMG. GSMG, on the other hand, point to testimony that the Board of GSMG had not approved the policy other than for its use in July of 1996 (in unrelated lay-offs) and that the policy was no longer in effect in October of 1996, as well as to evidence that the severance paid to others was done in a manner different than that laid out in the Severance Policy (claiming, for example, that the Board made a decision in April 1997 to extend severance to the ten people not hired by HIP despite their belief in the lack of a severance policy). Though this is a genuine dispute of fact, this Court need not belabor the details of this dispute, for it is not material. If (giving all inferences to defendants) GSMG did not have a severance policy in October of 1996, then there is no other document or law which would entitle the Former Employees to severance, and plaintiffs would lose their claims. If, on the other hand (giving all inferences to plaintiffs), the Severance Policy was official GSMG policy in October of 1996, defendants are still entitled to summary judgment because, as explained below, the Former Employees' jobs were not abolished.

because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On these exceptionally well-briefed cross-motions for summary judgment, the respective parties assert that the material facts are not in dispute and that, under these undisputed facts, each is entitled to judgment as a matter of law. The Court agrees that no genuine dispute of material fact exists, and each claim asserted by plaintiffs is ripe for determination upon this record.

### B. *Whether Plaintiffs' Jobs Were Abolished*

 As plaintiffs explain, ERISA's reach extends broadly to include all employee benefits. *In re New Valley Corp.,* 89 F.3d 143, 148 (3d Cir.1996), *cert. denied,* 519 U.S. 1110, 117 S.Ct. 947, 136 L.Ed.2d 835 (1997). Nearly all severance policies are ERISA-based welfare benefit plans. *See Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989). Indeed, under ERISA, severance plans are specifically classified as welfare benefit plans. 29 U.S.C. §§ 186(c) and 1002(1). Further, welfare benefit plans such as severance plans are subject to ERISA's fiduciary standards. 29 U.S.C. § 1021; *Deibler v. United Food and Commercial Workers' Local Union 23,* 973 F.2d 206, 209 (3d Cir.1992).

 Under ERISA, an employee welfare benefit plan is designed to include any "plan, fund or program" which is established or maintained by an employer for the purpose of providing benefits to its participants and beneficiaries. 29 U.S.C. § 1002(3). Eligibility for severance benefits depends upon the explicit terms of the plan. *See, e.g., Weir v. Federal Asset Disposition Ass'n,* 123 F.3d 281, 287 (5th Cir. 1997). Section 1132(a) of ERISA autho-rizes civil actions, such as the instant one, to recover benefits under the terms of a plan.

The parties dispute whether or not the Severance Policy which Gerald Miller drafted constituted official policy of GSMG in the fall of 1996. As explained in footnote eight, *supra,* plaintiffs contend, based on Miller's testimony, that the policy had been approved by the Board and was in effect at the time, while defendants contend, based on others' testimony, that the Board did not approve the so-called Severance Policy and that no severance policy was in effect at the time. The Court need not decide which version is correct. If defendants are correct that there was no severance policy in effect at the relevant time, then plaintiffs are not entitled to severance because there is no policy or law which provides for severance. However, even if plaintiffs are correct that the Severance Policy which Miller drafted was official and in operation at the relevant time, plaintiffs are still not entitled to severance because the terms of the Severance Policy limit severance to those whose jobs have been abolished. As a matter of law and fact, the Former Employees' jobs were not abolished.

 Plaintiffs contend that GSMG abolished their jobs, thus entitling them to severance under the Severance Policy, which, for the purposes of this Opinion, this Court will deem to have constituted official GSMG policy. Plaintiffs rely largely on the testimony of Gerald Miller, three years after the fact, in which he once responded "yes" to the question of whether the Former Employees' jobs were abolished (after repeatedly answering "no" when the question was phrased in other ways). That testimony, however, has no effect on this Court's decision. This Court's duty is to determine whether the actions which GSMG took with regard to

the Former Employees entitles the Former Employees to severance from GSMG because, within the terms of the Severance Policy, GSMG abolished the Former Employees' jobs. This is a legal determination, and the Court must make that legal determination for itself, Mr. Miller's once-expressed opinion of the meaning of the term "abolish" notwithstanding.

■ Plaintiffs also contend that even if this Court finds that plaintiffs are not entitled to summary judgment, this Court should not grant summary judgment for defendant because the Severance Policy does not define abolish. Though it is true that the Severance Policy does not itself define "abolish," this does not mean that the Severance Policy is, as plaintiffs suggest, ambiguous. Courts look to the objective intent manifested in the language of a contract and the words used in a contract must be given their "plain and ordinary meaning." *Dome Petroleum, Ltd. v. Employers Mut. Liability Ins. Co. of Wisconsin,* 767 F.2d 43, 47 (3d Cir. 1985). Although the Severance Policy lacks a provision which specifically provides a definition of "abolish," when the document is read as a whole, the term is far from ambiguous. As the fourth paragraph of the Severance Policy states, the term refers to "[w]hen jobs must be abolished at a work site because the function is eliminated or fewer employees are needed to perform a given function. . . ."

More importantly, the first paragraph of the Severance Policy is completely unambiguous in its requirement that a decision to abolish a job be made by the Regional Medical Director or by the Department Chief, "in consultation with the Senior Director, Organization Development and/or Director of Employee Rela-

tions." [9] Miller may have opined that the jobs were "abolished," and he may have written a memo on October 7, 1996 which told employees that they would be laid off if HIP did not hire them by 4:00 p.m. that day, but Miller's authority (as Senior Director of Organization Development) to make a decision with regard to job abolishment was limited to consulting with Regional Medical Directors or Department Chiefs. The language of the first paragraph of the Severance Policy leaves no doubt that a job abolishment cannot occur without an affirmative approval of job abolishment (through reduction in number of employees needed for a function or through function elimination). The record contains absolutely no evidence, through Miller's testimony or otherwise, that a Regional Medical Director or Department Chief affirmatively approved the elimination of a function or a reduction of the number of employees needed for a function. Job abolishment in this severance policy denotes an active decision by GSMG, through its Regional Medical Director or Department Chief, that a function is eliminated or that fewer persons are needed to perform a given function.

To the contrary, the undisputed evidence of record shows that HIP essentially gutted GSMG by hiring away almost all of GSMG's workforce, taking over the functions previously performed by GSMG, and refusing to provide the funding (including for salaries) previously provided for those functions. This all occurred in accordance with a court order that GSMG fought against tooth and nail, attempting to retain its workforce and the funding to pay that workforce. Miller—whose authority was only to consult on the decision as to whether to abolish jobs—apparently believed

---

**9.** "Authority to approve non-physician job abolishments is delegated to the Regional Medical Director or Department Chief in con-

sultation with the Senior Director, Organization Development and/or Director of Employee Relations." (Severance Policy, ¶ 1.)

that the workforce was being laid off, and he sent a letter to that effect, but there is no evidence whatsoever that the Regional Medical Director or Department Chief affirmatively approved job abolishments or lay-offs. If this Court determines eligibility for severance benefits based upon the explicit terms of the plan, as plaintiffs have encouraged this Court to do, there is no job abolishment which leads to severance without that approval by the Regional Medical Director or Department Chief.

The Severance Policy notes that a job abolishment occurs when GSMG either reduces the number of employees needed for a function or eliminates a function altogether. The appropriate persons did not engage in affirmative acts to abolish those jobs; instead, GSMG withered away in the face of HIP's solicitation of GSMG's employee base and take over of certain job functions. Therefore, the jobs were not abolished within the meaning of the Severance Policy. *See also Hennessy v. FDIC,* 58 F.3d 908 (3d Cir.1995); *Lesman v. Ransburg Corp.,* 719 F.Supp. 619 (W.D.Mich.1989).

### C. *The Counts of Plaintiffs' Second Amended Complaint*

Because this Court has found that plaintiffs' jobs were not abolished within the meaning of the Severance Policy, plaintiffs' claim that GSMG and its fiduciaries violated ERISA by not granting severance (Count I) obviously cannot stand. Plaintiffs' motion for summary judgment as to Count I will be denied, and summary judgment will be granted in favor of GSMG on that Count.

■ GSMG is also entitled to summary judgment on Counts II and III as well. Count II asserts that GSMG breached its obligation under ERISA, as fiduciary, to speak truthfully, by misinforming the plaintiffs regarding the circumstances giving rise to GSMG's obligation to pay severance. According to plaintiffs,

> [c]ontrary to the plain language of its Severance Plan which provides for severance pay in the event of job abolishment, GSMG informed its employees that if they did not accept employment with HIP, then they would be considered to have voluntarily resigned from GSMG and would thereby be ineligible to receive severance benefits under GSMG's Severance Plan. GSMG's fiduciaries further informed its employees that if they were hired by HIP, then they would be leaving voluntarily and would not be eligible for severance benefits.

(Pls.' Br. at 10.) Even if GSMG were held to be bound by the words written Miller, who was, by his own testimony, not an officer of GSMG, given that GSMG did not abolish plaintiffs' jobs, GSMG cannot be held to have spoken untruthfully in violation of ERISA. Plaintiffs' motion for summary judgment on Count II will be denied, and summary judgment will be granted to GSMG on Count II.

■ Finally, in Count III, plaintiffs contend that GSMG are liable for breach of contract and the covenant of good faith and fair dealing, in violation of New Jersey law, because the Severance Plan, which was a contract, required GSMG to pay severance in the case of a job abolishment and because the covenant required that GSMG not take action that would injure the plaintiffs' rights to receive the fruits of that contract. By "imposing additional and extrinsic requirements upon the contract… (e.g., regarding offers of employment from NJ HIP)," plaintiffs argue, GSMG violated both the contract and the covenant. As this Court has held that no reasonable juror could find that GSMG abolished plaintiffs' jobs, GSMG's refusal to grant severance could not have consti-

tuted a breach of contract or covenant. Therefore, this Court will deny plaintiffs' motion for summary judgment on Count III, and grant summary judgment to GSMG on this Count, as well.[10]

## III. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment will be denied, and GSMG's motion for summary judgment will be granted. Judgment will be entered in favor of GSMG and against plaintiffs, dismissing Counts I, II, and III of the Second Amended Complaint. Additionally, for reasons expressed in Part II.A of this Opinion, the Court will administratively terminate the Third Party Complaint.

### ORDER

This matter comes before the court upon plaintiffs' motion for summary judgment as to liability and upon defendant's motion for summary judgment against plaintiffs; and the Court having considered the parties' submissions; and for the reasons expressed in an Opinion of today's date;

IT IS this 22nd day of August, 2000 hereby

ORDERED that plaintiffs' motion for summary judgment be, and hereby is, *DENIED;* and it is

ORDERED that defendant's motion for summary judgment be, and hereby is, *GRANTED,* and that Counts I, II, and III of the Second Amended Complaint are DISMISSED WITH PREJUDICE; and it is

ORDERED that the Clerk shall ADMINISTRATIVELY TERMINATE the Third Party Complaint.

---

**10.** This Court need not reach the parties' disputes regarding the alleged need to look to extrinsic evidence of whether the Severance

JUDGMENT to be entered for defendant and against plaintiffs.

Policy was the official GSMG policy or regarding alleged additional problems of union employees in getting severance.